**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA WEST and KRISTINE HOLLANDER, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ACT II JEWELRY, LLC, a Delaware limited liability corporation d/b/a lia sophia, KIAM EQUITIES CORPORATION, a Delaware corporation, VICTOR K. KIAM, III, and ELENA KIAM, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>CLASS ACTION COMPLAINT</u>

Joseph J. Siprut
*jsiprut@siprut.com*
Todd L. McLawhorn
*tmclawhorn@siprut.com*
John Marrese
*jmarrese@siprut.com*
**SIPRUT PC**
17 North State Street
Suite 1600
Chicago, Illinois 60602
312.236.0000
Fax: (312) 754-9616
**www.siprut.com**

*Attorneys for Plaintiffs
And the Proposed Putative Classes*

Plaintiffs Cynthia West and Kristine Hollander, individually and on behalf of all others similarly situated, by and through their counsel, bring this Class Action Complaint against Defendants ACT II Jewelry, LLC d/b/a lia sophia ("Lia Sophia"), Kiam Equities Corporation, Victor K. Kiam, III, and Elena Kiam. Plaintiffs complain and allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I.   NATURE OF THE ACTION

1.     Lia Sophia is one of the country's largest fashion jewelry sellers.  Until December 2014, Lia Sophia utilized a direct selling "party plan" business model via a network of sales advisors.  Those sales advisors primarily marketed jewelry by conducting "jewelry parties" in the homes of customers.  At its peak, Lia Sophia had over 30,000 sales advisors who sold more than $300 million of costume jewelry a year.

2.     An essential part of that direct-sales model was Lia Sophia's "unrivaled lifetime replacement guarantee."  In its catalogs and marketing materials, Lia Sophia repeatedly promised that it would replace any jewelry it sold, for as long as the customer owned the jewelry.  The lifetime guarantee enabled Lia Sophia to charge more for its jewelry than the prices typically commanded in the market for fashion or costume jewelry.  In the event Lia Sophia was unable to replace the jewelry, Lia Sophia's guarantee, by its terms, provided the customer with a certificate that the customer could redeem for another piece of jewelry of comparable value.  As such, both the lifetime guarantee and any subsequently issued certificates were part of the contract that Lia Sophia formed with its customers.

3.     On December 1, 2014, Lia Sophia abruptly announced that it was winding down its U.S. and Canadian operations by December 31, 2014, and would cease operations by the end of

February 2015.  Lia Sophia also announced that all certificates would expire December 28, 2014.

4.     Notwithstanding the announcement of its imminent closing (and Lia Sophia's subsequent dismissal of its sale force), Lia Sophia continued to operate and shifted its model to an online e-commerce operation, which had the effect of bypassing its sales advisors.  Through its online presence, Lia Sophia continues to sell off its old inventory directly to customers.  However, as Plaintiffs and numerous other customers will attest, Lia Sophia refuses to honor its lifetime guarantee on prior purchases, and ignores customer requests for replacements or repairs.  Indeed, Lia Sophia posted the following statement on its own Facebook page in response to the scores of complaints: "Unfortunately, the lifetime replacement guarantee that was offered on purchases prior to 12/28/2014 is no longer valid."[1]

5.     Worse, Lia Sophia appears to have known for much of 2014 that it was going to shut down its business, eliminate its sales advisors, and repudiate the lifetime guarantees on all the jewelry previously sold.  Yet, Lia Sophia induced its sales advisors to continue to sell and recruit, and to purchase additional products and supplies from Lia Sophia, despite knowing that Lia Sophia would not be around for its sales advisors to ever recover on those purchases and recruitments.  Similarly, Lia Sophia continued to sell jewelry to customers with its lifetime guarantee, all the while knowing it was going to close its business and attempt to extinguish the guarantee.

6.     In addition, Lia Sophia's new direct sales model directly contradicts repeated statements and promises that Lia Sophia made to its sales advisors concerning the sales process: that Lia Sophia would never bypass its sales advisors and sell directly to customers.

7.     Plaintiffs accordingly bring this case on behalf of two classes:  (1) all purchasers of Lia Sophia jewelry; and (2) all individuals who have sold jewelry for Lia Sophia.  Plaintiffs assert

---

[1] *See* www.facebook.com/liasophia/post/10153046089092933 (last visited June 22, 1015).

-3-

claims for breach of contract, violation of the Illinois Consumer Fraud and Deceptive Practices Act, fraud, and unjust enrichment, and seek to recover the damages they and all Class members have suffered as the result of Lia Sophia's conduct.

## II.   JURISDICTION AND VENUE

8.     This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1332(d)(2).  In the aggregate, Plaintiffs' claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interests and costs, and there are numerous class members who are citizens of states other than Defendants' states of citizenship.   This Court has personal jurisdiction over Defendants because Defendants conduct substantial business and own, use, or possess real estate in the State of Illinois.  In addition, substantial portions of the wrongdoing alleged in this Complaint took place in Illinois.

9.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(1), (2), and 1391(c).  By carrying out substantial business in this District, Defendants are deemed to reside here and are subject to this District's personal jurisdiction.  Furthermore, a substantial part of the events giving rise to the claims emanated from activities within this District.

## III.   PARTIES

*Plaintiffs*

10.     Cindy West is a natural person currently domiciled in Fairfax, Iowa.  For purposes of 28 U.S.C. § 1332, Plaintiff West is a citizen of the State of Iowa.  Plaintiff West worked as a sales advisor for Lia Sophia for nearly three years.  Plaintiff West also purchased numerous pieces of Lia Sophia jewelry for her personal use.

11.     Plaintiff Kris Hollander is a natural person currently domiciled in Cedar Rapids, Iowa.  For purposes of 28 U.S.C. § 1332, Plaintiff is a citizen of the State of Iowa.  Plaintiff

Hollander purchased Lia Sophia jewelry for her personal use through an authorized Lia Sophia representative.

*Defendants*

12.     Defendant ACT II Jewelry, LLC is a Delaware limited liability corporation, d/b/a lia sophia, with headquarters currently located in Roselle, Illinois (hereinafter "Lia Sophia").  All customer orders and requests for exchanges or replacements are sent to either Bensenville or Roselle, Illinois.

13.     Defendant Kiam Equities Corporation ("KEC") is a Delaware corporation with its principal place of business in New York, New York.  KEC is the sole member of Lia Sophia. Thus, for purpose of 28 U.S.C. § 1332, both Lia Sophia and KEC are citizens of the States of Delaware and New York.

14.     Defendant Victor K. Kiam, III ("Tory Kiam") is a citizen of New York.  Tory Kiam is the Chief Executive Officer of Lia Sophia and the President of KEC.  Upon information and belief, Tory Kiam is an owner of KEC.

15.     Defendant Elena Kiam is a citizen of New York.  Elena Kiam is the Creative Director of Lia Sophia.  Upon information and belief, Elena Kiam is an owner of KEC.

## IV.    <u>FACTUAL BACKGROUND</u>

*Lia Sophia's Business*

16.     For over forty years Lia Sophia and its predecessor company distributed fashion jewelry through a network of sales representatives referred to as "Sales Advisors."  Lia Sophia's Sales Advisors primarily marketed the jewelry by conducting "jewelry parties" in the homes of customers.  This is commonly known as a "party plan" business model, similar to the models used to sell Avon and Tupperware.

17.     Sales Advisors earn 30% or more commissions on their sales.  In addition, there are sales incentives consisting of vacations and special jewelry that are provided to high performers. Sales Advisors can also earn additional compensation by recruiting new sales advisors, and receiving commissions on sales made by those new sales advisors.

18.     Lia Sophia had thousands of Sales Advisors throughout the United States.  While many Sales Advisors sold Lia Sophia jewelry on a part-time basis, some higher-level Sales Advisors (typically Division Leaders, Regional Leaders and Zone Leaders) worked full-time for Lia Sophia, and made six-figure annual incomes.  According to Lia Sophia's Fall/Winter 2013 Catalog, the average annual earnings for Sales Advisors was $8,280 annually, for Unit Leaders $27,180, for Division Leaders $58,100, for Region Leaders $140,880, and for Zone Leaders $508,470.  In 2010, Lia Sophia CEO Tory Kiam told Fox News that the company had one advisor with over $100 million in sales with a team of 8,000 people; Tory Kiam claimed that individual made over $3 million annually.

19.     Network Marketing Central provided an honorable mention for Lia Sophia in its 2012 Top MLM Companies by Global Revenue, as a company that routinely nets more than $100 million a year.[2]

20.     Until December 2014, Lia Sophia sold its jewelry exclusively through its Sales Advisors.  And, Lia Sophia repeatedly stated that it would not bypass its Sales Advisors and sell directly to customers.  For example, at the 2006 Elevation conference in which he addressed Lia Sophia's Sales Advisors, Tory Kiam stated: "Lastly, you also should know that the Home Office does not compete with you in selling our jewelry.  Unlike many other direct selling companies, we

---

[2] *See* http://www.networkmarketingcentral.com/2013/02/19/top-50-mlm-companies-global-revenue/ (last visited June 22, 2015).

have never sold our product in retail stores or over the internet against you. The only way a consumer who wants to purchase lia sophia jewelry can do so is from you and your teams."

21.     Similarly, in a 2010 Fox News interview, Tory Kiam made clear the importance of Lia Sophia's sales force: "We will not compete against our advisors. That's something that is very important to me."

22.     Prior to December 2014, Lia Sophia did not sell directly to customers via the internet.

***Lia Sophia's Lifetime Replacement Guarantee***

23.     A central facet of Lia Sophia's business model was its lifetime replacement guarantee. In its catalogs and marketing materials, Lia Sophia repeatedly promised that it would replace any jewelry it sold, for as long as the customer owned the jewelry. In the event Lia Sophia was unable to replace the jewelry, Lia Sophia would provide the customer with a certificate that the customer could redeem for another piece of jewelry of comparable value to the returned piece.

24.     Lia Sophia prominently featured its lifetime replacement guarantee, in writing, throughout every feature of the sales process.

25.     First, the lifetime replacement guarantee is scattered throughout Lia Sophia's catalogs. For example, on page 2 of the Lia Sophia Fall/Winter 2013 Catalog, under the Section entitled "Meet the lia sophia family," there are messages from two individuals, Tory Kiam as CEO, and Elena Kiam as Creative Director. Tory Kiam states: "In addition, every lia sophia purchase comes with our unmatched Lifetime Replacement Guarantee—one that we offer with confidence and pride." Similarly, on page 13, Elana Kiam states: "I'm only happy when you're happy—that's why we have our unmatched Lifetime Replacement Guarantee. You're going to look fabulous!" And once again, on page 94, in a section encouraging its customers to engage in social

media, and "love us, friend us, tweet us, watch us, pin us," Lia Sophia touts its guarantee: "Style

We Stand Behind. Every high-quality lia sophia piece is backed by our unrivaled Lifetime

Replacement Guarantee. Have a problem with it? No problem."

26.     Second, the lifetime replacement guarantee is prominently displayed on the

Customer Selection Ticket, *i.e.*, the order form, and states:

> **LIFETIME REPLACMENT GUARANTEE**
>
> (Proof of Purchase Required)
>
> At **lia sophia**, Customer satisfaction is our No. 1 priority. To ensure
> that we always exceed your expectations, we offer a full Lifetime
> Replacement Guarantee. Merchandise must be purchased through
> an authorized representative of **lia sophia** for this guarantee to
> apply. Because the guarantee is offered by **lia sophia**, ALL returns
> or exchanges must be handled through the company and NOT the
> Advisor. Shipping charges are not refundable, and refunds are not
> available after 45 days from original Show ship date. Jewelry may
> be returned for replacement due to a manufacturer's defect, with
> your original Customer Purchase Receipt/proof of purchase. Return
> shipping is at the Customer's expense. Jewelry returned within 120
> days will be replaced at no charge. If your original selection is no
> longer available, you will receive a merchandise certificate. After
> 120 days, please add a $5 PER ITEM handling charge. Lifetime
> Replacement Guarantee does not cover lost jewelry.

(Ex. 1 hereto.)

27.     Third, the Customer Exchange Form, which is on the reverse side of the Customer

Purchase Receipt and which every customer receives along with her jewelry purchase, contains

virtually the same language:

> **At lia sophia, Customer satisfaction is our No. 1 priority.** We offer
> a full Lifetime Replacement Guarantee. Merchandise must be
> purchased through an authorized representative of lia sophia for this
> guarantee to apply. ALL returns or exchanges MUST be handled
> through the company and NOT the Advisor. Shipping charges are not
> refundable, and cash refunds are not available after 45 days from
> original Show ship date.
> - Jewelry may be returned for replacement due to a
>   manufacturer's defect, with your original Customer Purchase

-8-

Receipt/proof of purchase. Return shipping is at the Customer's expense.
- Jewelry returned within 120 days will be replaced at no charge.
- After 120 days, please a $5 PER ITEM handling charge.
- If your original selection is no longer available, you will receive a merchandise certificate equal to the retail value at time of purchase.
- Merchandise certificate received for a returned item will expire 6 months from the date issued.
- Lifetime Replacement Guarantee does not cover lost jewelry.

(Ex. 2 hereto.)

28.     The Customer Exchange Form goes on to list seven "reason codes." Those codes are: (1) broken; (2) wrong items/size ordered; (3) incorrect item/size received; (4) missing/defective stone; (5) defective finish; (6) not as pictured/expected; (7) other. (*Id.*) As is clear from the reason codes, the lifetime replacement guarantee covered everything other than lost jewelry—including "other." (*Id.*)

29.     Although Lia Sophia only sold its jewelry through its Sales Advisors until December 2014, Lia Sophia maintained a web presence prior to that time, and featured its jewelry on its website. As part of that now defunct website, Lia Sophia maintained a page for "Frequently Asked Questions." The first question related to its lifetime replacement guarantee:

> **What is the guarantee on lia sophia jewelry?**
> We want you to be happy. That's why every lia sophia piece is backed by our unrivaled Lifetime Replacement Guarantee. Have a problem with it? No problem.
> Through our Lifetime Replacement Guarantee, jewelry may be returned to lia sophia for replacement due to a manufacturer's defect, with your original Customer Purchase Receipt/proof of purchase. Simply return the product through your preferred shipping method and we'll take care of the rest. Jewelry returned within 120 days will be replaced at no charge. After 120 days, please add a $5 per item handling charge. If your original selection is no longer available, you will receive a Merchandise Certificate. Merchandise certificates received for a return item will expire in six months from the date issued.
> Please note, merchandise must be purchased through an authorized representative of lia sophia for this guarantee to apply. The Lifetime

Replacement Guarantee does not cover lost jewelry. Shipping charges are not refundable, and cash refunds are not available after 45 days from original Show ship date.

While your Advisors can answer any questions you may have, returns and exchanges are handled directly through lia sophia headquarters. We're with you every step of the way - contact our expert Customer Service team by calling (800) 959-3324.[3]

**Lia Sophia's Closure**

30.      In late 2013 and early 2014, Lia Sophia allegedly began to experience financial trouble and was in need of a cash infusion. Tory Kiam, Lia Sophia's CEO, stated at a meeting in the first quarter of 2014 that he would not invest further in Lia Sophia. Lia Sophia hired Lazard and later Mackinaw Partners to find an investor, but they were unsuccessful.

31.      In May 2014, the Kiams told their chief jewelry designer, Ann Wooten, that she should remove the photographs of the Kiams' daughters from the 2014 Fall/Winter catalog. The Kiams explained that they did not want their daughters associated with a failing company.

32.      In June 2014, the Kiams cancelled the annual conference of Sales Advisors and laid off a number of workers. That same month, Tom Lang, the President of Lia Sophia, told Ann Wooten to lay off members of the jewelry design team as they would not be needed to create designs for spring 2015. Later, Tory Kiam told Ann Wooten not to spend any money on the spring/summer 2015 designs because the company probably would be out of business by then. None of that information was shared with Lia Sophia's Sales Advisors, customers or Plaintiffs.

33.      In September 2014, the last potential investor declined to invest in Lia Sophia. Ann Wooten was told the company definitely would close. By this time, Lia Sophia's President and Vice-President of Sales were no longer with the company. Ann Wooten was asked to remain with

---

[3] *See* https://web.archive.org/web/20131108174922/http://www.liasophia.com/regional/faq (last visited June 22, 2015).

-10-

Lia Sophia and help the company liquidate, which she agreed to do. Once again, none of that information was shared with Lia Sophia's Sales Advisors, customers or Plaintiffs.

34.     Meanwhile, although the Kiams were telling Ann Wooten that Lia Sophia needed a cash infusion, the Kiams failed to tell Ann Wooten at least part of the reason. It was rumored that the Kiams had been siphoning millions of dollars out of the company. Any such diversion of money from Lia Sophia would be to the detriment of Lia Sophia's creditors, including potential claims by Sales Advisors and customers.

35.     Lia Sophia continued to utilize its Sales Advisors through Thanksgiving 2014, and continued to advertise its business through, among other things, Facebook and a Lia Sophia internet blog operated by Elena Kim. On November 14, 2014, Elena Kim touted an upcoming Black Friday sale: "When you buy one gorgeous look, you get two more at half off."[4] There was no mention that Lia Sophia was planning to close, or that Lia Sophia was going to repudiate the lifetime replacement guarantee.

36.     Similarly, on November 24, 2014, Lia Sophia uploaded a video to YouTube (which was linked from Lia Sophia's Facebook page on November 25, 2014) touting various customer discounts and sales incentives for its Sales Advisors.[5] To all of its customers and Sales Advisors, Lia Sophia appeared to be operating as normal.

37.     Thus, it was shocking news when on December 1, 2014—the Monday following Thanksgiving Day weekend—Lia Sophia suddenly announced that it was winding down its operations in the United States and Canada and that its Sales Advisors would be selling its Fall/Winter 2014 collection at discounted prices through December 31, 2014.

---

[4] *See* http://liasophiablog.com/2014/11/14/black-friday-sale (last visited June 22, 2015).
[5] *See* https://www.youtube.com/watch?v=rcodN-vnL0c (last visited May 27, 2015).

38.     The reaction from Lia Sophia's customer base and Sales Advisors was, according to the hundreds of comments posted on Lia Sophia's Facebook page in the first week of December 2014, nearly unanimous—surprise at the closing, disappointment and concern over the continued viability of the lifetime guarantee, and outrage by those Sales Advisors who recently purchased jewelry, catalogs, promotional items and business cards for upcoming (and now cancelled) Lia Sophia parties.

39.     In response to some of the comments on its Facebook page, Lia Sophia stated on December 13, 2014 that it would honor its lifetime guarantee until December 28, 2014.[6]  However, Lia Sophia noted that after December 28, 2014, Lia Sophia would no longer accept returns.  As recently as May 21, 2015, Lia Sophia reiterated that it has unilaterally dishonored its lifetime guarantee:  "Unfortunately Colleen, the lifetime replacement guarantee that was offered on purchases prior to 12/28/2014 is no longer valid."[7]

40.     After Lia Sophia terminated its network of Sales Advisors, Lia Sophia continued to sell its products on the internet at www.shopliasophia.com.   Initially, Lia Sophia characterized its continued sales as a sell-down of its excess inventory.  Subsequently, in May 2015 Lia Sophia announced that "the demand for lia sophia has been so strong and our customer's response so positive that we have decided to continue to sell all of the available inventory we have, and begin to explore other business models."[8]

41.     As part of that new model, Lia Sophia has bypassed its Sales Advisors, and has directly emailed the customers of its former Sales Advisors, and referred those customers directly

---

[6] *See* https://www.facebook.com/liasophia (last visited June 22, 2015).
[7] *See* www.facebook.com/liasophia (last visited June 22, 2015).
[8] *See* www.facebook.com/hashtag/liasophia?source=feed_text&story_id=10152783337727933 (last visited May 28, 2015).

to the Lia Sophia website. Lia Sophia is not paying its former Sales Advisors any commissions for any of those sales.

***Relationship Among Defendants***

42.     Lia Sophia markets itself as a family-owned company that is owned and operated by Tory and Elena Kiam. Indeed, the company name Lia Sophia is derived from the names of Tory and Elena Kiam's daughters.

43.     Both Tory and Elena Kiam were heavily involved in the day to day operations of Lia Sophia. Tory Kiam is the CEO of Lia Sophia. Elena Kiam is the Creative Director of Lia Sophia. Both Tory and Elana Kim are featured prominently in Lia Sophia's catalogs, and are identified as the Lia Sophia "family." And, both Tory and Elena Kiam went on NBC's Today Show in December 2012 to tout the benefits of Lia Sophia jewelry.

44.     Lia Sophia is a "doing business as" name. In reality, Lia Sophia's corporate form is ACT II Jewelry, LLC, a Delaware limited liability corporation. KEC is the sole member of the ACT II/Lia Sophia LLC. The majority, and perhaps the only, owners of KEC are Tory and Elena Kiam. Tory and Elena Kiam are frequently identified in the media as the owners of Lia Sophia.

45.     Tory Kiam and Elena Kiam decided not to invest any additional money in Lia Sophia in the first quarter of 2014. They knew that this decision would likely force Lia Sophia to close.

46.     In 2014, upon information and belief, KEC took distributions from Lia Sophia in excess of $2 million. Tory Kiam and Elena Kiam caused KEC to take these distributions from Lia Sophia and personally benefited from these distributions by virtue of their ownership of KEC. This diversion of cash from Lia Sophia had the effect of transferring money from Lia Sophia that could be used to either (a) continue the business or (b) pay Lia Sophia's creditors, which would

include customers with returns and those requesting Lia Sophia honor the lifetime guarantee.

47.     Tory Kiam and Elena Kiam made the decision to announce the closure of Lia Sophia on December 1, 2014.

48.     Tory Kiam and Elena Kiam made the decision to repudiate the lifetime replacement guarantee on Lia Sophia jewelry.

49.     Tory Kiam and Elena Kiam made the decision to terminate Lia Sophia's sale force and start a direct sales business model.

50.     Tory Kiam and Elena Kiam made the decision to continue to operate Lia Sophia notwithstanding the prior December 2014 announcement that Lia Sophia was ceasing all operations.

51.     KEC, Tory Kiam and Elena Kiam are virtually indistinguishable from Lia Sophia.

52.     Accordingly, the Court should pierce the corporate veil of Lia Sophia to reach KEC, Tory Kiam and Elena Kiam, and hold KEC, Tory Kiam and Elena Kiam responsible for Lia Sophia's actions.

***Plaintiff Hollander's Experience***

53.     In 2013 and 2014, Plaintiff Hollander purchased jewelry from Lia Sophia through an authorized Lia Sophia representative.  Plaintiff Hollander purchased the jewelry based on the express condition that the jewelry contained a lifetime replacement guarantee, as described above.

54.     Lia Sophia has now refused to honor the lifetime replacement guarantee. Accordingly, Plaintiff Hollander is entitled to either a refund of the purchase price, or damages for the amount of the diminished value of the jewelry without a guarantee.  Similarly, the Customer Class (defined below) has been damaged, *inter alia*, in the following ways:

        a.  All members of the Customer Class have purchased jewelry that contains a lifetime

guarantee that has now been repudiated by Lia Sophia, thus causing a diminution in the value of their purchase;

b.  Those members of the Customer Class who have unredeemed certificates or vouchers have been harmed because Lia Sophia unilaterally imposed subsequent conditions that make those certificates or vouchers worthless;

c.  Those members of the Customer Class who returned jewelry to Lia Sophia and did not receive a replacement product or certificate are owed the value of that product; and

d.  Those members of the Customer Class who did not receive their purchases from Lia Sophia are owed a refund of all monies paid.

***Plaintiff West's Experience***

55.  Plaintiff West sold Lia Sophia jewelry as a Sales Advisor for the past three years.

56.  Through her own efforts and those of others she recruited, Plaintiff West created a network of customers who purchased jewelry from Lia Sophia. Plaintiff West cultivated those customers so that she could earn commission on purchases those customers made from Lia Sophia.

57.  Lia Sophia subsequently has usurped the benefits of Plaintiff West's efforts by selling jewelry directly to those customers.

58.  In 2014, Lia Sophia incentivized its sales force by offering certain jewelry promotions and trips based on specific sales and recruiting goals. Plaintiff West attempted to achieve those incentives by arranging for parties, selling Lia Sophia jewelry and recruiting. Plaintiff West was unable to meet those sales and recruiting goals because Lia Sophia's announcement of its closure stymied future sales.

59.  In 2014, Plaintiff West achieved goals that entitled her to select certain jewelry

from Lia Sophia in the future at greatly discounted prices. But Lia Sophia never designed the jewelry. Plaintiff West was unable to select any of this jewelry because of Lia Sophia's closure.

60.     In 2014, Plaintiff West purchased supplies directly from Lia Sophia. Those supplies included catalogs, promotional jewelry, and order forms. Plaintiff West intended to use those supplies to continue selling additional Lia Sophia jewelry. Those supplies have no commercial use other than in connection with selling Lia Sophia jewelry. At the time Lia Sophia sold those supplies to Plaintiff West, Lia Sophia – including its owner KEC, and Tory and Elena Kiam – knew that Lia Sophia was going to close, which would render Plaintiff West unable to recoup those expenditures.

61.     Other Sales Advisors have made similar purchases, including the purchases of starter kits.

62.     The Sales Advisor Class (defined below) has been damaged, *inter alia*, in the following ways:

      a.   The Sales Advisors purchased supplies and jewelry from Lia Sophia for use in selling Lia Sophia's jewelry, but have been precluded from selling Lia Sophia jewelry and thus have lost the value of those investments; and

      b.   The Sales Advisors developed networks of customers to whom they sold jewelry, and Lia Sophia has now usurped that network for its own ends by eliminating the Sales Advisors and selling directly to those customers.

## V.    CLASS ACTION ALLEGATIONS

63.    Plaintiff West brings this action on behalf of herself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All individuals who sold jewelry for Lia Sophia (the "Sales Advisor Class").

Excluded from the Sales Advisor Class are Defendants, and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

64.    Plaintiff Hollander brings this action on behalf of herself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a subclass defined as:

> All individuals who purchased jewelry from Lia Sophia (the "Customer Class").

Excluded from the Customer Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

65.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

66.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all members of the Class is impracticable. There

are thousands of consumers who have been damaged by Lia Sophia's wrongful conduct as alleged herein. There are likewise thousands of Sales Advisors who have been damaged by Lia Sophia's conduct. The precise number of Class members and their addresses is presently unknown to Plaintiffs, but may be ascertained from Lia Sophia's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

67. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)     Whether Lia Sophia offered a lifetime replacement guarantee on its jewelry;

(b)     Whether Lia Sophia breached the contract of the terms of its sale with those customers that purchased products with lifetime replacement guarantees;

(c)     Whether Lia Sophia continued to sell jewelry with a lifetime replacement guarantee while planning to close and repudiate the guarantee;

(d)     Whether Lia Sophia sold supplies and jewelry to its Sales Advisors while planning to close and subsequently precluded the Sales Advisors from recouping those expenditures;

(e)     Whether Lia Sophia unfairly usurped the customer networks developed by its Sales Advisors by firing its sale force and then directly soliciting those same customers;

(f)     Whether Plaintiff and Class members have been injured and the proper measure of their losses as a result of those injuries; and

(g)     Whether Plaintiff and the other Class members are entitled to injunctive or declaratory relief, and the nature of such relief.

68. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class members because, among other things, all Class members were comparably injured through the uniform misconduct described above.

69.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**
Plaintiffs are adequate Class representatives because their respective interests do not conflict with
the interests of the Class members they seek to represent; they have retained counsel competent
and experienced in complex commercial and class action litigation; and Plaintiffs intend to
prosecute this action vigorously. Class members' interests will be fairly and adequately protected
by Plaintiffs and their counsel.

70.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**
Lia Sophia has acted or refused to act on grounds generally applicable to Plaintiffs and the other
Class members, thereby making appropriate final injunctive and declaratory relief, as described
below.

71.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).**   A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action. The
damages or other financial detriment suffered by Plaintiffs and the other Class members are
relatively small compared to the burden and expense that would be required to individually litigate
their claims against Defendants, so it would be impracticable for Class members to individually
seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual
litigation, the court system could not.  Individualized litigation creates a potential for inconsistent
or contradictory judgments, and increases the delay and expense to all parties and the court system.
By contrast, the class action device presents far fewer management difficulties, and provides the
benefits of single adjudication, economy of scale, and comprehensive supervision by a single
court.

## VI.     CLAIMS ALLEGED

### COUNT I
**Breach of Contract**
**(On behalf of the Customer Class Against Lia Sophia and KEC)**

72.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 71 above as if fully set forth herein.

73.     Plaintiff Hollander, and each member of the Customer Class, formed a contract with Lia Sophia at the time Plaintiff and the other members of the Customer Class purchased jewelry with lifetime warranties.  The terms of that contract include the promises and affirmations of fact made by Lia Sophia through its marketing, described above.

74.     The contract is a valid, enforceable contract supported by consideration.  The product packaging and advertising constitute express warranties and became part of the basis of the bargain, on which Plaintiff and the members of the Customer Class relied.  These terms are part of a standardized contract between Plaintiff and the members of the Customer Class on the one hand and Lia Sophia on the other.

75.     All conditions precedent to Lia Sophia's liability under this contract have been performed by Plaintiff and the Class.

76.     Plaintiff and each of the members of the Class are not in breach of the contracts.

77.     Lia Sophia breached the contracts by failing to honor its promise to replace the jewelry in the event the customer returned the jewelry.

78.     Lia Sophia also issued merchandise certificates to customers when it was unable to replace jewelry that had been returned by customers.  Lia Sophia further breached the contracts by retroactively voiding the merchandise certificates by unilaterally announcing the certificates would expire on December 28, 2014.  Similarly, Lia Sophia breached the contracts by not permitting

customers to use the certificates or by refusing to accept the certificates for purchases on its website.

79.     Lia Sophia further breached the contracts by failing to ship jewelry that customers had purchased and paid for.

80.     KEC is also responsible for Lia Sophia's breach of contract by virtue of its complete ownership and control of Lia Sophia.

81.     As a result of Lia Sophia's breach of its contracts, Plaintiff and the Customer Class have been damaged in an amount to be proven at trial, including but not limited to the amount of the purchase price of the jewelry that they purchased.

## COUNT II
**Violation of the Illinois Consumer Fraud Act**
**(On Behalf of the Customer Class Against all Defendants)**

82.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 71 above as if fully set forth herein.

83.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("ICFA"), prohibits the use of unfair or deceptive acts or practices in the conduct of trade or commerce.  The ICFA is to be liberally construed.

84.     Defendants engaged in the following unfair or deceptive acts or practices in the conduct of trade or commerce:

a.  Lia Sophia sold its products with a lifetime replacement guarantee, yet it knew for those products it sold in 2014 that it would not honor the guarantee because it was going to close; and

b.  Lia Sophia provided certificates to customers with six month expiration dates in lieu of product replacements, yet it knew it would not honor those certificates

because it was either going to unilaterally declare the certificates expired or make it impossible for the customers to redeem the certificates.

85.     Lia Sophia intended for the Customer Class to rely upon its promises of a lifetime replacement guarantee.

86.     Lia Sophia sold its products to the Customer Class in trade or commerce within Illinois. Lia Sophia's physical facility is located in Illinois, it made its representations (including the lifetime replacement guarantee) in Illinois, and it shipped its products from Illinois.

87.     KEC as the sole member of Lia Sophia controlled all aspects of Lia Sophia's business, and directly benefited from Lia Sophia's conduct. In fact, KEC is the alter ego of Lia Sophia, and there is no material distinction between the two entities.

88.     Tory Kiam and Elena Kiam were officers of Lia Sophia and the owners of KEC. The Kiams controlled Lia Sophia and directed its activities, including the use of the lifetime replacement guarantee. The Kiams made, or were involved in, every major decision effecting Lia Sophia's business, including the use of the lifetime replacement guarantee, the repudiation of that guarantee, the decision to terminate its sales advisors, the decision to close its business, the decision to continue operating Lia Sophia via its internet presence, and the decision not to pay Sales Advisors commissions on direct internet sales.

89.     As a result of Defendants' use or employment of the aforementioned unfair deceptive acts or practices, Plaintiff and each of the other members of the Customer Class have sustained damages in an amount to be proven at trial.

90.     Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

<u>COUNT III</u>
**Common Law Fraud**
**(On Behalf of the Customer Class Against All Defendants)**

91.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 71 above as if fully set forth herein.

92.     Lia Sophia made several representations or material omissions that it knew to be false, including:

      a.  Lia Sophia sold its products with a lifetime replacement guarantee, yet it knew for those products it sold in 2014 that it would not honor the guarantee because it was going to close; and

      b.  Lia Sophia provided certificates to customers with six month expiration dates in lieu of product replacements, yet it knew it would not honor those certificates because it was either going to unilaterally declare the certificates expired or make it impossible for the customers to redeem the certificates.

93.     It was reasonable for Plaintiff and the Customer Class to rely upon Lia Sophia's statements.

94.     Plaintiff and the Customer Class relied upon Lia Sophia's statements in purchasing the jewelry.

95.     Lia Sophia offered the lifetime replacement guarantee for the purpose of inducing Plaintiff and the Customer Class to purchase Lia Sophia jewelry.

96.     KEC as the sole member of Lia Sophia controlled all aspects of Lia Sophia's business, and directly benefited from Lia Sophia's conduct.  In fact, KEC is the alter ego of Lia Sophia, and there is no material distinction between the two entities.

97.     Tory Kiam and Elena Kiam were officers of Lia Sophia and the owners of KEC. The Kiams controlled Lia Sophia and directed its activities, including the use of the lifetime replacement guarantee.  The Kiams made, or were involved in, every major decision effecting Lia Sophia's business, including the use of the lifetime replacement guarantee, the repudiation of that guarantee, the decision to terminate its sales advisors, the decision to close its business, the decision to continue operating Lia Sophia via its internet presence, and the decision not to pay Sales Advisors commissions on direct internet sales.

98.     As a result of Defendants' statements, Plaintiff and each of the other members of the Customer Class have sustained damages in an amount to be proven at trial.

99.     Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

**COUNT IV**
**Unjust Enrichment**
**(In the alternative to Count I)**
**(On behalf of the Customer Class Against All Defendants)**

100.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 71 above as if fully set forth herein.

101.    Defendants sold the products based on untrue and misleading advertising, including failure to disclose material facts, as stated more fully above.   Specifically, Lia Sophia represented that its products contained a full lifetime replacement guarantee.

102.    By selling the products and not honoring the lifetime warranties as advertised, Lia Sophia received a benefit from Plaintiff and members of the Customer Class to which it was not entitled.   KEC as the sole member of Lia Sophia, and the Kiams as the owners of KEC, benefited in the same manner.

103.    Defendants knowingly appreciated and accepted this benefit, which resulted and continues to result in an inequity to Plaintiff and all members of the Customer Class.

104.    Defendants' retention of such benefit violates the fundamental principles of justice, equity, and good conscience.

105.    As a result of Defendants' unjust enrichment, Plaintiff and members of the Customer Class sustained damages in an amount to be determined at trial.  Plaintiff seeks full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT V**
**Violation of the Illinois Consumer Fraud Act**
**(On Behalf of the Sales Advisor Class Against all Defendants)**

106.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 71 above as if fully set forth herein.

107.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("ICFA"), prohibits the use of unfair or deceptive acts or practices in the conduct of trade or commerce.  The ICFA is to be liberally construed.

108.    Defendants engaged in the following unfair or deceptive acts or practices in the conduct of trade or commerce:

a.    Lia Sophia sold supplies and jewelry to its Sales Advisors in order for the Sales Advisors to sell Lia Sophia's products, yet it knew it was going to close and those Sales Advisors would never recoup their expenditures in those supplies and jewelry;

b. Lia Sophia continued to encourage its Sales Advisors to make sales and recruit new advisors, and offered future incentives for doing so, yet it knew it was going to close would never provide those incentives; and

c. Lia Sophia had always sold its jewelry through its Sales Advisors, and had assured its Sales Advisors that it would never bypass them and sell directly to the customers acquired by the Sales Advisors, yet Lia Sophia did precisely that starting in December 2014.

109.    Lia Sophia intended for the Plaintiff and the Sales Advisor Class to rely upon its promises.

110.    Lia Sophia sold its products to the Sales Advisor Class in trade or commerce within Illinois.  Lia Sophia's physical facility is located in Illinois, it made its representations (including the lifetime replacement guarantee) in Illinois, and it shipped its products from Illinois.

111.    KEC as the sole member of Lia Sophia controlled all aspects of Lia Sophia's business, and directly benefited from Lia Sophia's conduct.  In fact, KEC is the alter ego of Lia Sophia, and there is no material distinction between the two entities.

112.    Tory Kiam and Elena Kiam were officers of Lia Sophia and the owners of KEC. The Kiams controlled Lia Sophia and directed its activities, including the use of the lifetime replacement guarantee.  The Kiams made, or were involved in, every major decision effecting Lia Sophia's business, including the use of the lifetime replacement guarantee, the repudiation of that guarantee, the decision to terminate its sales advisors, the decision to close its business, the decision to continue operating Lia Sophia via its internet presence, and the decision not to pay commissions to its Sales Advisors for direct internet sales.

113.    As a result of Defendants' use or employment of the aforementioned unfair deceptive acts or practices, Plaintiff and each of the other members of the Sales Advisor Class have sustained damages in an amount to be proven at trial.

114.    Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

**COUNT VI**
**Common Law Fraud**
**(On Behalf of the Sales Advisor Class Against All Defendants)**

115.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 71 above as if fully set forth herein.

116.    Lia Sophia made several representations or material omissions that it knew to be false, including:

a.  Lia Sophia sold supplies and jewelry to its Sales Advisors in order for the Sales Advisors to sell Lia Sophia's products, yet it knew it was going to close and those Sales Advisors would never recoup their expenditures in those supplies and jewelry;

b.  Lia Sophia continued to encourage its Sales Advisors to make sales and recruit new advisors, and offered future incentives for doing so, yet it knew it was going to close would never provide those incentives; and

c.  Lia Sophia had always sold its jewelry through its Sales Advisors, and had assured its Sales Advisors that it would never bypass them and sell directly to the customers acquired by the Sales Advisors, yet Lia Sophia did precisely that starting in December 2014.

117.    It was reasonable for Plaintiff and the Sales Advisor Class to rely upon Lia Sophia's

statements.

118.    Plaintiff and the Sales Advisor Class relied upon Lia Sophia's statements in purchasing the jewelry.

119.    KEC as the sole member of Lia Sophia controlled all aspects of Lia Sophia's business, and directly benefited from Lia Sophia's conduct.  In fact, KEC is the alter ego of Lia Sophia, and there is no material distinction between the two entities.

120.    Tory Kiam and Elena Kiam were officers of Lia Sophia and the owners of KEC. The Kiams controlled Lia Sophia and directed its activities, including the use of the lifetime replacement guarantee.  The Kiams made, or were involved in, every major decision effecting Lia Sophia's business, including the use of the lifetime replacement guarantee, the repudiation of that guarantee, the decision to terminate its sales advisors, the decision to close its business, the decision to continue operating Lia Sophia via its internet presence, and the decision not to pay Sales Advisors commissions on direct internet sales.

121.    As a result of Defendants' statements, Plaintiff and each of the other members of the Sales Advisor Class have sustained damages in an amount to be proven at trial.

122.    Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

## COUNT VII
### Unjust Enrichment
**(On behalf of the Sales Advisor Class Against All Defendants)**

123.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 71 above as if fully set forth herein.

124.    Defendants sold the supplies and jewelry to the Sales Advisor Class based on untrue and misleading advertising, including failure to disclose material facts, as stated more fully above.

Specifically, Lia Sophia implied that it would continue to operate while it was in the process of selling supplies and jewelry to the Sales Advisor Class. Lia Sophia, and Tory Kiam, also specifically assured the Sales Advisor Class that Lia Sophia would never bypass the Sales Advisors and sell directly to customers.

125. By selling the supplies and jewelry to the Sales Advisors, and by selling jewelry directly to customers, Lia Sophia received a benefit from Plaintiff and Sales Advisor Class members to which it was not entitled. KEC as the sole member of Lia Sophia, and the Kiams as the owners of KEC, benefited in the same manner.

126. Defendants knowingly appreciated and accepted this benefit, which resulted and continues to result in an inequity to Plaintiff and all members of the Sales Advisor Class.

127. Defendants' retention of such benefit violates the fundamental principles of justice, equity, and good conscience.

128. As a result of Defendants' unjust enrichment, Plaintiff and all members of the Sales Advisor Class sustained damages in an amount to be determined at trial. Plaintiff seeks full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## VII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter an Order awarding the following relief:

(a)     Certifying this action as a class action; designating Plaintiffs as Representative for their respective classes; and appointing the undersigned as Class Counsel;

(b)     Awarding compensatory and actual damages, including restitution and disgorgement of Defendants' revenues to Plaintiffs and the other Class members generated from the unlawful practices set forth herein;

(c)     Enjoining Defendants from continuing the unlawful practices set forth herein;

(d)     Awarding attorneys' fees and costs to Plaintiffs and the other members of the Class; and

(e)     Such other and further relief as the Court deems just and proper.


Dated:  June 23, 2015                              Respectfully submitted,


                                                   By:_____*/s/ Todd L. McLawhorn*_____

                                                   Joseph J. Siprut
                                                   *jsiprut@siprut.com*
                                                   Todd L. McLawhorn
                                                   *tmclawhorn@siprut.com*
                                                   John Marrese
                                                   *jmarrese@siprut.com*
                                                   **SIPRUT PC**
                                                   17 North State Street
                                                   Suite 1600
                                                   Chicago, Illinois 60602
                                                   312.236.0000
                                                   Fax: (312) 754-9616
                                                   **www.siprut.com**


                                                   *Attorneys for Plaintiffs*
                                                   *And the Proposed Putative Classes*


4837-0700-4196, v. 1