## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA WEST, KRISTINE HOLLANDER, JENNIFER ZIMMERMAN, MARY ROMAN, MARIE ESPOSITO, and MICHELLE BALLON, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No. 1:15-cv-05569 |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| ACT II JEWELRY, LLC, a Delaware limited liability corporation d/b/a lia sophia, and VICTOR K. KIAM, III, | ) ) ) ) | |
| Defendants. | ) | |

### FIRST AMENDED CLASS ACTION COMPLAINT

Joseph J. Siprut
*jsiprut@siprut.com*
Todd L. McLawhorn
*tmclawhorn@siprut.com*
S**IPRUT** PC
17 North State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.754.9616
**www.siprut.com**

*Attorneys for Plaintiffs*
*And the Proposed Putative Classes*

Plaintiffs Cynthia West, Kristine Hollander, Jennifer Zimmerman, Mary Roman, Marie Esposito and Michelle Ballon, individually and on behalf of all others similarly situated, by and through their counsel, bring this First Amended Class Action Complaint against Defendants ACT II Jewelry, LLC d/b/a lia sophia ("Lia Sophia"), and Victor K. Kiam, III. Plaintiffs complain and allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I.   NATURE OF THE ACTION

1.     Lia Sophia is one of the country's largest fashion jewelry sellers. Until December 2014, Lia Sophia utilized a direct selling "party plan" business model via a network of sales advisors. Those sales advisors primarily marketed jewelry by conducting "jewelry parties" in the homes of customers. At its peak, Lia Sophia had over 30,000 sales advisors who sold more than $300 million of costume jewelry a year.

2.     An essential part of that direct-sales model was Lia Sophia's "unrivaled lifetime replacement guarantee." In its catalogs and marketing materials, Lia Sophia repeatedly promised that it would replace any jewelry it sold, for as long as the customer owned the jewelry. The lifetime guarantee enabled Lia Sophia to charge more for its jewelry than the prices typically commanded in the market for fashion or costume jewelry. In the event Lia Sophia was unable to replace the jewelry, Lia Sophia's guarantee, by its terms, provided the customer with a certificate that the customer could redeem for another piece of jewelry of comparable value. As such, both the lifetime guarantee and any subsequently issued certificates were part of the contract that Lia Sophia formed with its customers.

3.     On December 1, 2014, Lia Sophia abruptly announced that it was winding down its

U.S. and Canadian operations by December 31, 2014, and would cease operations by the end of February 2015. Lia Sophia also announced that all certificates would expire December 28, 2014.

4.      Notwithstanding the announcement of its imminent closing (and Lia Sophia's subsequent dismissal of its sale force), Lia Sophia continued to operate and shifted its model to an online e-commerce operation, which had the effect of bypassing its sales advisors. Through its online presence, Lia Sophia continues to sell off its old inventory directly to customers. However, as Plaintiffs and numerous other customers will attest, Lia Sophia refuses to honor its lifetime guarantee on prior purchases, and ignores customer requests for replacements or repairs. Indeed, Lia Sophia posted the following statement on its own Facebook page in response to the scores of complaints: "Unfortunately, the lifetime replacement guarantee that was offered on purchases prior to 12/28/2014 is no longer valid."[1]

5.      Worse, Lia Sophia and Tory Kiam knew for much of 2014 that Lia Sophia was going to shut down its business, eliminate its sales advisors, and repudiate the lifetime guarantees on all the jewelry previously sold. Yet, Lia Sophia induced its sales advisors to continue to sell and recruit, and to purchase additional products and supplies from Lia Sophia, despite knowing that Lia Sophia would not be around for its sales advisors to ever recover on those purchases and recruitments. Similarly, Lia Sophia continued to sell jewelry to customers with its lifetime guarantee, all the while knowing it was going to close its business and attempt to extinguish the guarantee.

6.      In addition, Lia Sophia's new direct-sales model directly contradicts repeated statements and promises that Lia Sophia made to its sales advisors concerning the sales process: that Lia Sophia would never bypass its sales advisors and sell directly to customers.

---

[1] *See* www.facebook.com/liasophia/post/10153046089092933 (last visited June 22, 2015).

7.     Plaintiffs accordingly bring this case on behalf of the customers who purchased jewelry from Lia Sophia and the sales advisors who sold jewelry for Lia Sophia.  Plaintiffs assert claims for breach of contract, violation of the Illinois Consumer Fraud and Deceptive Practices Act, fraud, and unjust enrichment, and seek to recover the damages they and all Class members have suffered as the result of Lia Sophia's conduct.

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1332(d)(2).  In the aggregate, Plaintiffs' claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interests and costs, and there are numerous class members who are citizens of states other than Defendants' states of citizenship.   This Court has personal jurisdiction over Defendants because Defendants conduct substantial business and own, use, or possess real estate in the State of Illinois.  In addition, substantial portions of the wrongdoing alleged in this Complaint took place in Illinois.

9.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(1), (2), and 1391(c).  By carrying out substantial business in this District, Defendants are deemed to reside here and are subject to this District's personal jurisdiction.  Furthermore, a substantial part of the events giving rise to the claims emanated from activities within this District.

## III.     PARTIES

*Plaintiffs*

10.     Plaintiff Cynthia West is a natural person currently domiciled in Fairfax, Iowa.  For purposes of 28 U.S.C. § 1332, Plaintiff West is a citizen of the State of Iowa.  Plaintiff West worked as a sales advisor for Lia Sophia for nearly three years.  Plaintiff West also purchased numerous pieces of Lia Sophia jewelry for her personal use.

11.     Plaintiff Kristine Hollander is a natural person currently domiciled in Cedar Rapids, Iowa.  For purposes of 28 U.S.C. § 1332, Plaintiff Hollander is a citizen of the State of Iowa.  Plaintiff Hollander purchased Lia Sophia jewelry for her personal use through an authorized Lia Sophia representative.

12.     Plaintiff Jennifer Zimmerman is a natural person currently domiciled in Norway, Iowa.  For purposes of 28 U.S.C. § 1332, Plaintiff Zimmerman is a citizen of the State of Iowa.  Plaintiff Zimmerman signed up to become a sales advisor with Lia Sophia in October 2014 and paid $99 for her initial starter kit.

13.     Plaintiff Mary Roman is a natural person currently domiciled in Crown Point, Indiana.  For purposes of 28 U.S.C. § 1332, Plaintiff Roman is a citizen of the State of Indiana.  Plaintiff Roman worked as a sales advisor for Lia Sophia for approximately ten years.  Plaintiff Roman also purchased numerous pieces of Lia Sophia jewelry for her personal use.

14.     Plaintiff Marie Esposito is a natural person currently domiciled in Plainfield, Illinois.  For purposes of 28 U.S.C. § 1332, Plaintiff Esposito is a citizen of the State of Illinois.  Plaintiff Esposito worked for Lia Sophia for approximately five years.  Plaintiff Esposito also purchased numerous pieces of Lia Sophia jewelry for her personal use.

15.     Plaintiff Michelle Ballon is a natural person currently domiciled in Bolingbrook, Illinois.  For purposes of 28 U.S.C. § 1332, Plaintiff Ballon is a citizen of the State of Illinois.  Plaintiff Ballon purchased Lia Sophia jewelry for her personal use through an authorized Lia Sophia representative.

***Defendants***

16.     Defendant ACT II Jewelry, LLC is a Delaware limited liability corporation, d/b/a lia sophia, with headquarters currently located in Roselle, Illinois (hereinafter "Lia Sophia").  All

customer orders and requests for exchanges or replacements are sent to either Bensenville or Roselle, Illinois.

17.     Defendant Victor K. Kiam, III ("Tory Kiam") is a citizen of New York.  Tory Kiam is the Chief Executive Officer of Lia Sophia and the President of Kiam Equities Corporation ("KEC").  KEC is the sole member of Lia Sophia.

## IV.     <u>FACTUAL BACKGROUND</u>

### *Lia Sophia's Business*

18.     For over forty years Lia Sophia and its predecessor company distributed fashion jewelry through a network of sales representatives referred to as "Sales Advisors."  Lia Sophia's Sales Advisors primarily marketed the jewelry by conducting "jewelry parties" in the homes of customers.  This is commonly known as a "party plan" business model, similar to the models used to sell Avon and Tupperware.

19.     Sales Advisors earn 30% or more commissions on their sales.  In addition, there are sales incentives consisting of vacations and special jewelry that are provided to high performers. Sales Advisors can also earn additional compensation by recruiting new sales advisors, and receiving commissions on sales made by those new sales advisors.

20.     Lia Sophia had thousands of Sales Advisors throughout the United States.  While many Sales Advisors sold Lia Sophia jewelry on a part-time basis, some higher-level Sales Advisors (typically Division Leaders, Regional Leaders and Zone Leaders) worked full-time for Lia Sophia, and made six-figure annual incomes.  According to Lia Sophia's Fall/Winter 2013 Catalog, the average annual earnings for Sales Advisors was $8,280 annually, for Unit Leaders $27,180, for Division Leaders $58,100, for Region Leaders $140,880, and for Zone Leaders $508,470.  In 2010, Lia Sophia CEO Tory Kiam told Fox News that the company had one advisor

with over $100 million in sales with a team of 8,000 people; Tory Kiam claimed that individual made over $3 million annually.

21.     Lia Sophia's seasonal catalogs were a critical component of the sales process.  Lia Sophia's catalogs were highly polished and produced, and featured professional models, along with information about the company and personal messaging from Tory and Elena Kiam.  The catalogs were used by the sales advisors to show their potential customers the entire jewelry line, and importantly, the actual size of the jewelry, which was critical to a purchase decision.  Similarly, the catalogs were also used by sales advisors to recruit new sales advisors to join their marketing teams.  For each seasonal catalog produced, Lia Sophia typically ordered over one millions copies.  Without physical catalogs, it would be difficult to sell the jewelry.

22.     Network Marketing Central provided an honorable mention for Lia Sophia in its 2012 Top MLM Companies by Global Revenue, as a company that routinely nets more than $100 million a year.[2]

***Exclusivity of Sales Advisors***

23.     Until December 2014, Lia Sophia sold its jewelry exclusively through its Sales Advisors for over twenty years.  Throughout the years, Tory Kiam repeatedly promised that Lia Sophia would only sell through its Sales Advisors, and would not directly compete against its Sales Advisors.  For example:

> a.  At the 2006 Elevation conference in which he addressed Lia Sophia's Sales Advisors, Tory Kiam stated: "Lastly, you also should know that the Home Office does not compete with you in selling our jewelry.  Unlike many other direct selling

---

[2] *See* http://www.networkmarketingcentral.com/2013/02/19/top-50-mlm-companies-global-revenue/ (last visited June 22, 2015).

companies, we have never sold our product in retail stores or over the internet against you. The only way a consumer who wants to purchase lia sophia jewelry can do so is from you and your teams."

b.  Similarly, in a 2010 Fox News interview, Tory Kiam made clear the importance of Lia Sophia's sales force: "We will not compete against our advisors. That's something that is very important to me."

c.  In 2012, in Milwaukee at the Lia Sophia national sales conference attended by many Sales Advisors, Tory Kiam concluded his speech to those Sales Advisors by noting that Lia Sophia jewelry was only available through "you and your teams."

d.  In 2013, in Indianapolis at a national sales conference attended by many Sales Advisors, Tory Kiam stated that one of the primary reasons that Sales Advisors should sell, and continue to sell, for Lia Sophia was that Lia Sophia would never sell in stores, never bypass Advisors, and would send all customer inquiries to Sales Advisors. Indeed, Tory Kiam claimed that major department stores, such as J.C. Penny's, had approached Lia Sophia and inquired about carrying Lia Sophia's jewelry, only to be rebuffed by Tory Kiam because Tory Kiam insisted that Lia Sophia jewelry would only be sold through its Sales Advisors. Tory Kiam also referred to the Sales Advisors as part of the Lia Sophia "family," as he had done on numerous occasions.

24.  Similar statements to the effect that Lia Sophia would only sell through its Sales Advisors and would not sell directly to customers were made by other Lia Sophia management personnel to Plaintiff West and other Sales Advisors, including statements by Aleks Bogdanovski and Jim Turner. Similar statements were made by Division Leaders and other Sales Advisors

during the recruitment process.

25.     Lia Sophia had a policy of referring any customer inquiries that were made to the home office to the Sales Advisor who was nearest geographically to the customer making the inquiry.

26.     Prior to December 2014, Lia Sophia did not sell directly to customers via the internet.

***Lia Sophia's Relationship with its Sales Advisors***

27.     Although Tory Kiam repeatedly referred to Lia Sophia advisors as "family," in fact Lia Sophia treated its Sales Advisors as independent contractors.

28.     Thus, Lia Sophia continued to stress, in presentations by Tory Kiam, in its marketing materials, and in its training materials, that its Sales Advisors were in complete and total control of their respective independent businesses.  Lia Sophia, through Tory Kiam and other executives, regularly characterized the result of the Sales Advisors' labor as "your business."  Lia Sophia never claimed that it had a business or ownership interest in the independent businesses of its Sales Advisors.  At the 2012 and 2013 national sales conferences, and other times, Tory Kiam told the Sales Advisors they were "CEOs" of their respective businesses.

29.     Lia Sophia's Sales Advisors sold jewelry to their respective individually-built networks, which typically consisted of their friends, family and contacts.  In other words, the Sales Advisors identified potential customers, and sold Lia Sophia jewelry to those customers.  To the extent any of those potential customers purchased Lia Sophia jewelry, those customers did so as the result of the efforts of the Sales Advisors.  Those customers were customers of the Sales Advisors from whom they purchased Lia Sophia jewelry, and thus were part of the Sales Advisors' independent businesses.  Those customers had no independent relationship with Lia Sophia.

30.     Although Lia Sophia required Sales Advisors to sign Advisor Agreements in order to place orders and receive commissions, the Advisor Agreements were silent concerning ownership of customer information and did not provide Lia Sophia with the right to use the customer information uploaded by the Sales Advisors into the Lia Sophia ordering system.

31.     The business practice of Lia Sophia, and the reasonable expectation of the Sales Advisors, was that the customer base and customer information developed by the Sales Advisors was the property of the Sales Advisors.  The Sales Advisors did not expect, much less authorize, the direct sale by Lia Sophia of its jewelry to those customers.

***Lia Sophia's Lifetime Replacement Guarantee***

32.     A central facet of Lia Sophia's business model was its lifetime replacement guarantee.  The predecessor company to Lia Sophia had been purchased by the Kiam family in 1986 by Victor Kiam, II, who had achieved great success with other business ventures in which quality had been paramount.  For example, the senior Mr. Kiam promoted the Remington razor with his famous promise "shaves as close as a blade or your money back," which was aired repeatedly in a series of iconic television commercials in the 1980s.

33.     Lia Sophia adopted a similar approach to quality with its lifetime replacement guarantee.  In its catalogs and marketing materials, Lia Sophia repeatedly promised that it would replace any jewelry it sold, for as long as the customer owned the jewelry.  In the event Lia Sophia was unable to replace the jewelry, Lia Sophia would provide the customer with a certificate that the customer could redeem for another piece of jewelry of comparable value to the returned piece.

34.     Lia Sophia prominently featured its lifetime replacement guarantee, in writing, throughout every feature of the sales process.

35.     First, the lifetime replacement guarantee is scattered throughout Lia Sophia's

catalogs. For example, on page 2 of the Lia Sophia Fall/Winter 2013 Catalog, under the Section entitled "Meet the lia sophia family," there are messages from two individuals, Tory Kiam as CEO, and Elena Kiam as Creative Director. Tory Kiam states: "In addition, every lia sophia purchase comes with our unmatched Lifetime Replacement Guarantee—one that we offer with confidence and pride." Similarly, on page 13, Elana Kiam states: "I'm only happy when you're happy— that's why we have our unmatched Lifetime Replacement Guarantee. You're going to look fabulous!" And once again, on page 94, in a section encouraging its customers to engage in social media, and "love us, friend us, tweet us, watch us, pin us," Lia Sophia touts its guarantee: "Style We Stand Behind. Every high-quality lia sophia piece is backed by our unrivaled Lifetime Replacement Guarantee. Have a problem with it? No problem."

36. Second, the lifetime replacement guarantee is prominently displayed on the Customer Selection Ticket, *i.e.*, the order form, and states:

> **LIFETIME REPLACEMENT GUARANTEE**
>
> (Proof of Purchase Required)
>
> At **lia sophia**, Customer satisfaction is our No. 1 priority. To ensure that we always exceed your expectations, we offer a full Lifetime Replacement Guarantee. Merchandise must be purchased through an authorized representative of **lia sophia** for this guarantee to apply. Because the guarantee is offered by **lia sophia**, ALL returns or exchanges must be handled through the company and NOT the Advisor. Shipping charges are not refundable, and refunds are not available after 45 days from original Show ship date. Jewelry may be returned for replacement due to a manufacturer's defect, with your original Customer Purchase Receipt/proof of purchase. Return shipping is at the Customer's expense. Jewelry returned within 120 days will be replaced at no charge. If your original selection is no longer available, you will receive a merchandise certificate. After 120 days, please add a $5 PER ITEM handling charge. Lifetime Replacement Guarantee does not cover lost jewelry.

(Ex. 1 hereto.)

37. Third, the Customer Exchange Form, which is on the reverse side of the Customer

Purchase Receipt and which every customer receives along with her jewelry purchase, contains virtually the same language:

> **At lia sophia, Customer satisfaction is our No. 1 priority.** We offer a full Lifetime Replacement Guarantee. Merchandise must be purchased through an authorized representative of lia sophia for this guarantee to apply. ALL returns or exchanges MUST be handled through the company and NOT the Advisor. Shipping charges are not refundable, and cash refunds are not available after 45 days from original Show ship date.
>
> - Jewelry may be returned for replacement due to a manufacturer's defect, with your original Customer Purchase Receipt/proof of purchase. Return shipping is at the Customer's expense.
> - Jewelry returned within 120 days will be replaced at no charge.
> - After 120 days, please a $5 PER ITEM handling charge.
> - If your original selection is no longer available, you will receive a merchandise certificate equal to the retail value at time of purchase.
> - Merchandise certificate received for a returned item will expire 6 months from the date issued.
> - Lifetime Replacement Guarantee does not cover lost jewelry.

(Ex. 2 hereto.)

38. The Customer Exchange Form goes on to list seven "reason codes." Those codes are: (1) broken; (2) wrong items/size ordered; (3) incorrect item/size received; (4) missing/defective stone; (5) defective finish; (6) not as pictured/expected; (7) other. (*Id.*) As is clear from the reason codes, the lifetime replacement guarantee covered everything other than lost jewelry—including "other." (*Id.*)

39. Lia Sophia's training materials for its Sales Advisors emphasized the value and importance of the lifetime replacement guarantee. It was a common sales technique for Sales Advisors to tell customers that they could return jewelry for any reason, even if it was because the customer broke the particular piece of jewelry. Sales Advisors did not tell customers that jewelry could only be returned for a manufacturer's defect.

40. Throughout 2012, 2013 and the first eleven months of 2014, Lia Sophia's practice

-12-

was to accept returns and provide replacement jewelry or merchandise certificates, without regard to whether the returned jewelry did or not exhibit a manufacturer's defect.

41.     Prior to December 2014, Lia Sophia never refused to honor the lifetime replacement guarantee on the basis that the returned item did not exhibit a manufacturer's defect.

42.     Although Lia Sophia only sold its jewelry through its Sales Advisors until December 2014, Lia Sophia maintained a web presence prior to that time, and featured its jewelry on its website.  As part of that now defunct website, Lia Sophia maintained a page for "Frequently Asked Questions."  The first question related to its lifetime replacement guarantee:

> **What is the guarantee on lia sophia jewelry?**
> We want you to be happy. That's why every lia sophia piece is backed by our unrivaled Lifetime Replacement Guarantee. Have a problem with it? No problem.
> Through our Lifetime Replacement Guarantee, jewelry may be returned to lia sophia for replacement due to a manufacturer's defect, with your original Customer Purchase Receipt/proof of purchase. Simply return the product through your preferred shipping method and we'll take care of the rest. Jewelry returned within 120 days will be replaced at no charge. After 120 days, please add a $5 per item handling charge. If your original selection is no longer available, you will receive a Merchandise Certificate. Merchandise certificates received for a return item will expire in six months from the date issued.
> Please note, merchandise must be purchased through an authorized representative of lia sophia for this guarantee to apply. The Lifetime Replacement Guarantee does not cover lost jewelry. Shipping charges are not refundable, and cash refunds are not available after 45 days from original Show ship date.
> While your Advisors can answer any questions you may have, returns and exchanges are handled directly through lia sophia headquarters. We're with you every step of the way - contact our expert Customer Service team by calling (800) 959-3324.[3]

---

[3] *See* https://web.archive.org/web/20131108174922/http://www.liasophia.com/regional/faq (last visited June 22, 2015).

*Lia Sophia's Closure*

43.     In late 2013 and early 2014, Lia Sophia allegedly began to experience financial trouble and was in need of a cash infusion.  Tory Kiam, Lia Sophia's CEO, stated at an internal management meeting in January of 2014 that he would not invest further in Lia Sophia.  At that time, Tory Kiam began planning to shut down Lia Sophia.

44.     In May 2014, the Kiams told their chief jewelry designer, Ann Wooten, that she should remove the photographs of the Kiams' daughters from the 2014 Fall/Winter catalog.  The Kiams explained that they did not want their daughters associated with a failing company.  That instruction required Ann Wooten to stop the production of the catalog in order to produce a new cover for the catalog.

45.     By late May 2014, Tory Kiam had decided to close Lia Sophia.  Indeed, Tory Kiam provided explicit instructions to order only the minimum number of catalogs necessary until Lia Sophia announced it was shutting down.  From that time forward, Tory Kiam had no intention of ordering any more jewelry for Lia Sophia to sell, but rather intended that Lia Sophia sell off its inventory and close.

46.     In June 2014, Lia Sophia laid off over 50 employees in its Illinois headquarters.  That same month, Tom Lang, the President of Lia Sophia, told Ann Wooten to lay off members of the jewelry design team as they would not be needed to create designs for spring 2015.

47.     Because they were closing, Lia Sophia management discussed how they were going to inform the sales advisors and customers of the closure.  In the first week of June of 2014, Lia Sophia management, including Elena Kiam, Marcia Cota, Tom Lang and Tory Kiam, exchanged emails discussing how they would announce the closure.

48.     At the same time, the annual conference of Sales Advisors was to take place in

Indianapolis beginning on June 20, 2014.

49.     Lia Sophia management, led by Tory Kiam, decided to cancel the annual conference.  Lia Sophia informed its Sales Advisors that the annual conference was cancelled around June 11, 2014.[4] But, significantly, Lia Sophia management decided **not** to tell the Sales Advisors of Lia Sophia's upcoming closure.

50.     Instead, on June 17, 2014, Tory Kiam emailed Lia Sophia's Sales Advisors to let them know that, notwithstanding the cancellation of the annual sales conference, and the headquarters layoffs, Lia Sophia intended to remain open and that it was "business as usual" for Lia Sophia.

51.     To cover up the fact that Lia Sophia was going to close, Tory Kiam took several steps designed to induce Lia Sophia's Sales Advisors to continue working for Lia Sophia so that its inventory would be sold at the most optimal price, and to maximize Lia Sophia's profits.

52.     Specifically, on June 18, 2014, Tory Kiam retained Mackinac Partners to serve as a "restructuring financial advisor," who would attempt to obtain additional investors.  But Tory Kiam and the Kiam family had already decided they would no longer invest in Lia Sophia, so it was highly unlikely any outside investor would be interested.

53.     Although Tory Kiam had retained Mackinac Partners, he continued to pretend Lia Sophia was going to stay open.  On June 24, 2014, Tory and Elena Kiam sent an email to their Sales Advisors, in which they stated, among other things, "we ask that you do your part by booking, selling and recruiting and have your teams do the same thing."

54.     On July 2, 2014, the Lia Sophia Board of Managers conducted a special meeting.

---

[4] Lia Sophia management frequently communicated with its Sales Advisors via email, with emails sent from a no-reply Lia Sophia email address.  Sometimes those emails would contain content with Tory Kiam or Elena Kiam's signatures, but oftentimes those emails contained no signature and did not identify an individual author.

At that special meeting, the Board discussed various liquidation scenarios and the financial impact of the different closing scenarios upon the Kiam family's financial interests.

55.     By August 2014, Mackinac Partners was actively shopping Lia Sophia to potential liquidators.

56.     Around the same time, Tory Kiam instructed Ann Wooten to put together a "pretend" collection to make it appear to others within Lia Sophia that the company was proceeding with normal business operations.  Similarly, Tory Kiam told Ann Wooten not to spend any money on the spring/summer 2015 designs because the company probably would be out of business by then.  None of that information was shared with Lia Sophia's Sales Advisors, customers or Plaintiffs.

57.     Meanwhile, Lia Sophia offered several sales incentives to its Sales Advisors to continue to keep selling Lia Sophia jewelry and *to recruit new Sales Advisors,* notwithstanding that Tory Kiam knew full well that Lia Sophia was closing.  Thus, Lia Sophia offered Sales Advisors "double points" for sales in August towards a trip to the Atlantis Resort in the Bahamas scheduled for May 2015.  And Lia Sophia lowered the price of its "starter kit"—which was what new advisors who wished to sell Lia Sophia jewelry were required to buy—from $149 to $99. Similarly, Lia Sophia continued to tout to its Leaders (Sales Advisors who had achieved a certain level of sales and recruitment), a promised Paris trip for Spring of 2015 to the top five Leaders.

58.     At the same time, in September 2014, the last potential investor declined to invest in Lia Sophia.  Ann Wooten was told the company definitely would close.  By this time, Lia Sophia's President and Vice-President of Sales were no longer with the company.  Ann Wooten was asked to remain with Lia Sophia and help the company liquidate, which she agreed to do. Once again, none of that information was shared with Lia Sophia's Sales Advisors, customers or

Plaintiffs.

59.     On October 23, 2014, Tory Kiam amended Lia Sophia's engagement letter with Mackinac Partners to have Mackinac manage the closure of Lia Sophia.

60.     On October 27, 2014, Ann Wooten entered into a Key Employee Incentive Bonus Agreement with Lia Sophia that was designed to retain her services while the company closed.

61.     Notwithstanding the above steps to close Lia Sophia, Tory Kiam refrained from letting the Sales Advisors know of his plans to close.  To the contrary, Lia Sophia continued to send emails to its Sales Advisors with sales and recruiting incentives.

62.     In fact, a key feature of Lia Sophia's wind down plan with Mackinac was that the plan to close would be kept a secret, in order to maximize the revenue to Lia Sophia.

63.     On November 4, 2014, Lia Sophia sent an email to its Sales Advisors, including Plaintiffs West, Roman, Esposito and Zimmerman, offering jewelry premiums of $150 and $250, and a Privilege Purchase from the upcoming Spring/Summer 2015 Style Guide.  That offer was fraudulent because Lia Sophia was closing.

64.     On November 4, 2014, Lia Sophia offered an opportunity to its Sales Advisors, including Plaintiffs West, Roman and Esposito, to attend its Leadership Meeting in Orlando in January 2015 if those Sales Advisors were able to add three new Advisors to their sales teams. That offer was fraudulent because Lia Sophia was closing.

65.     On November 11, 2014, Lia Sophia sent an email to its Sales Advisors, including Plaintiff West, offering the opportunity to earn a showcase display valued at $225, which could be used for future sales of Lia Sophia jewelry.  That offer was fraudulent because Lia Sophia was closing.

66.     Lia Sophia continued to utilize its Sales Advisors through Thanksgiving 2014, and

continued to advertise its business through, among other things, Facebook and a Lia Sophia internet blog operated by Elena Kim. On November 14, 2014, Elena Kim touted an upcoming Black Friday sale: "When you buy one gorgeous look, you get two more at half off."[5] There was no mention that Lia Sophia was planning to close, or that Lia Sophia was going to repudiate the lifetime replacement guarantee.

67. Similarly, on November 24, 2014, Lia Sophia uploaded a video to YouTube (which was linked from Lia Sophia's Facebook page on November 25, 2014) touting various customer discounts and sales incentives for its Sales Advisors.[6] Indeed, Lia Sophia continued to tout the possible Atlantis trip, for which there remained two additional months to earn points towards the trip.

68. On November 26, 2014, Lia Sophia sent an email to all of its Sales Advisors with December sales strategies. The email noted "You'll also discover how you can earn Atlantis with only two months left to earn." This was fraudulent because Lia Sophia was closing.

69. The November 26, 2014 email from Lia Sophia to its Sales Advisors concluded by wishing them a Happy Thanksgiving and noting "In celebration of the Thanksgiving holiday, Customer Service will close at 5:00 p.m. CT on November 26. Additionally, the Home Office will be closed November 27-28. We will reopen on Monday, December 1." This was a lie because Lia Sophia was closing.

70. As a result of Lia Sophia's cover up, as of Thanksgiving 2014, to all of its customers and Sales Advisors, Lia Sophia appeared to be operating as normal.

71. Thus, it was shocking news when on December 1, 2014—the Monday following

---

[5] *See* http://liasophiablog.com/2014/11/14/black-friday-sale (last visited June 22, 2015).
[6] *See* https://www.youtube.com/watch?v=rcodN-vnL0c (last visited May 27, 2015).

Thanksgiving Day weekend—Lia Sophia suddenly announced that it was winding down its operations in the United States and Canada and that its Sales Advisors would be selling its Fall/Winter 2014 collection at discounted prices through December 31, 2014.

72. The reaction from Lia Sophia's customer base and Sales Advisors was, according to the hundreds of comments posted on Lia Sophia's Facebook page in the first week of December 2014, nearly unanimous—surprise at the closing, disappointment and concern over the continued viability of the lifetime guarantee, and outrage by those Sales Advisors who recently purchased jewelry, catalogs, promotional items and business cards for upcoming (and now cancelled) Lia Sophia parties.

73. In response to some of the comments on its Facebook page, Lia Sophia stated on December 13, 2014 that it would honor its lifetime guarantee until December 28, 2014.[7]  However, Lia Sophia noted that after December 28, 2014, Lia Sophia would no longer accept returns.

74. On December 22, 2014, Lia Sophia sent an email to its Sales Advisors reminding them as follows:  "Reminder—The last day we will receive mail for returned items will be December 28, 2014.  Any mail received after that date will be returned to the sender."

75. As recently as May 21, 2015, Lia Sophia reiterated that it has unilaterally dishonored its lifetime guarantee:  "Unfortunately Colleen, the lifetime replacement guarantee that was offered on purchases prior to 12/28/2014 is no longer valid."[8]

76. After Lia Sophia terminated its network of Sales Advisors, Lia Sophia continued to sell its products on the internet at www.shopliasophia.com.  Initially, Lia Sophia characterized its continued sales as a sell-down of its excess inventory.  Subsequently, in May 2015 Lia Sophia

---

[7] *See* https://www.facebook.com/liasophia (last visited June 22, 2015).
[8] *See* www.facebook.com/liasophia (last visited June 22, 2015).

announced that "the demand for lia sophia has been so strong and our customer's response so positive that we have decided to continue to sell all of the available inventory we have, and begin to explore other business models."[9]

77.    As part of that new model, Lia Sophia has bypassed its Sales Advisors, and has directly emailed the customers of its former Sales Advisors, and referred those customers directly to the Lia Sophia website.  Lia Sophia is not paying its former Sales Advisors any commissions for any of those sales.

***Lia Sophia's Continued Recruitment***

78.    Notwithstanding that Lia Sophia management, including Tory Kiam, Elena Kiam, Tom Lang and Ann Wooten, knew throughout the summer and fall of 2014 that Lia Sophia was going to be closing—and indeed was taking steps to maximize the sales of its inventory and to cut its costs—Lia Sophia continued to press its Sales Advisors to recruit new advisors.

79.    As part of that recruitment strategy, Lia Sophia lowered the price of its starter kit from $149 to $99, thus incentivizing prospective Sales Advisors to join.

80.    For example, Lia Sophia stated, in its monthly October 2014 "FACETS" brochure, which it sent to its thousands of Sale Advisors, that "Our $99 Style Kit Plus sale this month and the upcoming gift-giving season means now is the perfect time to start a lia sophia business."  The brochure went on to note, consistent with Lia Sophia's practices, that the best candidates to recruit were friends and family, and that they could potentially make $1,000 a month.

81.    And when those Sales Advisors purchased the starter kit, and submitted their starter show (their first event at which they would sell Lia Sophia jewelry), Marcia Cota of Lia Sophia

---

[9] *See* www.facebook.com/hashtag/liasophia?source=feed_text&story_id=10152783337727933 (last visited May 28, 2015).

would email new Sales Advisors with a weekly schedule for them to follow, which included the recruitment of a new advisor within approximately eight weeks and an opportunity to promote to leadership another seven or eight weeks thereafter. During this August through October 2014 period, Plaintiff West personally recruited four new Sales Advisors to sell Lia Sophia jewelry. All four of those Sales Advisors received emails from Marcia Cota of Lia Sophia setting forth weekly schedules, culminating in the recruitment of new advisors by those new advisors and promotion to leadership.

82. Those weekly schedules were fraudulent. Lia Sophia was closing, and none of the ultimate goals, such as recruiting new advisors or obtaining a promotion to leadership, were possible.

83. Not only did Lia Sophia continue to recruit new Sales Advisors after Tory Kiam and Lia Sophia management had decided to close the company, Lia Sophia even continued to provide resources to teach its Sales Advisors how to recruit new Sales Advisors for the soon-to-be-closed company. For example, on October 22, 2014, Lia Sophia sent an email to its Sales Advisors in which it offered "Online Learning" for recruitment training: "Recruiting with Confidence: Learn how top recruiters Jennifer Dunn, Crystal Sanchez and Heidi Dreger share the business with others, including how to do effective follow up, handle hesitations and guide them to the YES! Wednesday, October 29, at 11:00 a.m. – 12:00 p.m. CT. Register here."

84. Similarly, on November 4, 2014, Lia Sophia offered an opportunity to attend its Leadership Meeting in Orlando in January 2015 to its Sales Advisors who added three new Advisors to their sales teams. That offer was fraudulent in multiple ways and on multiple levels. First, Lia Sophia was closing and thus there would no January 2015 Leadership Meeting, so the promised reward was illusory. Second, having current Sales Advisors recruit New Sales Advisors,

without telling anyone that Lia Sophia was closing, caused those New Sales Advisors (once the truth came out) to blame the respective Sales Advisors who recruited them for getting them into the Lia Sophia mess in the first place and damaged the reputations of those Sales Advisors. Third, recruiting new Sales Advisors for a company that was going to be closing—without telling those new Sales Advisors—defrauded those individuals. In effect, the November 4, 2014 email was a "Triple Threat Fraud."

85.     Plaintiffs estimate that over one thousand new sales advisors were successfully (and unwittingly) recruited to join Lia Sophia by existing sales advisors *after* Tory Kiam had decided to close Lia Sophia.

***Relationship Among Defendants***

86.     Lia Sophia markets itself as a family-owned company that is owned and operated by Tory and Elena Kiam. Indeed, the company name Lia Sophia is derived from the names of Tory and Elena Kiam's daughters.

87.     Both Tory and Elena Kiam were heavily involved in the day to day operations of Lia Sophia. Tory Kiam is the CEO of Lia Sophia. Elena Kiam is the Creative Director of Lia Sophia. Both Tory and Elana Kim are featured prominently in Lia Sophia's catalogs, and are identified as the Lia Sophia "family." And, both Tory and Elena Kiam went on NBC's Today Show in December 2012 to tout the benefits of Lia Sophia jewelry.

88.     Lia Sophia is a "doing business as" name. In reality, Lia Sophia's corporate form is ACT II Jewelry, LLC, a Delaware limited liability corporation. KEC is the sole member of ACT II Jewelry, LLC. The majority, and perhaps the only, owners of KEC are Tory and Elena Kiam and Kiam family trusts. Tory and Elena Kiam are frequently identified in the media as the owners of Lia Sophia.

89.     Tory Kiam and Elena Kiam decided not to invest any additional money in Lia Sophia in the first quarter of 2014.  They knew that this decision would likely force Lia Sophia to close.

90.     Tory Kiam made, or had final approval over, the decision to announce the closure of Lia Sophia on December 1, 2014.

91.     Tory Kiam made, or had final approval over, the decision to repudiate the lifetime replacement guarantee on Lia Sophia jewelry.

92.     Tory Kiam made, or had final approval over, the decision to terminate Lia Sophia's sales force and start a direct-sales business model.

93.     Tory Kiam made, or had final approval over, the decision to keep secret Lia Sophia's plans to close and to not tell the Sales Advisors of Lia Sophia's plans.

94.     Tory Kiam made, or had final approval over, the decision to continue to operate Lia Sophia as an online business and to sell its inventory notwithstanding the prior December 2014 announcement that Lia Sophia was ceasing all operations.

***Plaintiff Hollander's Experience***

95.     In 2013 and 2014, Plaintiff Hollander purchased Lia Sophia jewelry from an authorized Lia Sophia representative.  Plaintiff Hollander purchased the jewelry based on the express condition that the jewelry contained a lifetime replacement guarantee, as described above.

96.     Plaintiff Hollander wishes to return a pair of earring, a necklace with a bracelet, and two other necklaces, because the jewelry is tarnished and/or broken, but has not done so because Lia Sophia has announced it will no longer honor its lifetime replacement guarantee.  In addition, with respect to any other remaining items purchased by Plaintiff Hollander, she may wish to return those items in the future, but will be unable to do so because of Lia Sophia's broken

promises.

97.     Plaintiff Hollander also has an unredeemed merchandise certificate, issued by Lia Sophia on November 11, 2014, with an expiration date of May 11, 2015. She was unable to redeem the certificate because she learned in 2015 that Lia Sophia was refusing to honor any such certificates.

98.     Plaintiff Hollander is entitled to either a refund of the purchase price, or damages for the amount of the diminished value of the jewelry without a guarantee. Plaintiff Hollander is also entitled to compensation for her unredeemed merchandise certificate.

***Plaintiff Ballon's Experience***

99.      Since approximately 2008, Plaintiff Ballon has purchased Lia Sophia jewelry through an authorized sales representative. Plaintiff Ballon purchased the jewelry based on the express condition that the jewelry contained a lifetime replacement guarantee, as described above.

100.     Lia Sophia has now refused to honor the lifetime replacement guarantee. Accordingly, Plaintiff Ballon is entitled to either a refund of the purchase price, or damages for the amount of the diminished value of the jewelry without a guarantee.

101.      Similarly, the Customer Class (defined below) has been damaged, *inter alia*, in the following ways:

    a.   All members of the Customer Class have purchased jewelry that contains a lifetime guarantee that has now been repudiated by Lia Sophia, thus causing a diminution in the value of their purchase;

    b.   Those members of the Customer Class who have unredeemed certificates or vouchers have been harmed because Lia Sophia unilaterally imposed subsequent conditions that make those certificates or vouchers worthless;

c. Those members of the Customer Class who returned jewelry to Lia Sophia and did not receive a replacement product or certificate are owed the value of that product;

d. Those members of the Customer Class who did not receive their purchases from Lia Sophia are owed a refund of all monies paid; and

e. Those members of the Customer Class who purchased jewelry after May 31, 2014 are entitled to full refunds because Lia Sophia sold the jewelry knowing it would not honor the lifetime replacement guarantee.

***Plaintiff West's Experience***

102. Plaintiff West sold Lia Sophia jewelry as a Sales Advisor from February 2012 until Lia Sophia terminated its sales force in December 2014.

103. In order to continue to place orders and receive commissions, Lia Sophia required Plaintiff West to sign an Advisor Agreement with an effective date of August 7, 2013. The Advisor Agreement was presented to Plaintiff West electronically over the internet when she logged into her Lia Sophia personal website to place orders. At that time, Plaintiff West was not provided with the terms or policies set forth in the Training Guide/lia sophia University, Advisor Advantage, the lia sophia Media Policy, the lia sophia Leader Agreement, the lia sophia Compensation Plan, or Lia Sophia's Glossary of Terms, all of which were purportedly incorporated by reference into the Advisor Agreement.

104. Through her own efforts and those of others she recruited, Plaintiff West created a network of customers who purchased jewelry from Lia Sophia. Plaintiff West cultivated those customers so that she could earn commissions on purchases those customers made from Lia Sophia.

105. Lia Sophia subsequently has usurped the benefits of Plaintiff West's efforts by

selling jewelry directly to those customers. The Advisor Agreement did not give Lia Sophia the right to sell jewelry directly to Plaintiff West's customers. Plaintiff West never gave Lia Sophia permission to market directly to her customers, or to use the customer information she had uploaded in Lia Sophia's ordering system.

106. In 2014, Lia Sophia incentivized its sales force by offering certain jewelry promotions and trips based on specific sales and recruiting goals. Plaintiff West attempted to achieve those incentives by arranging for parties, selling Lia Sophia jewelry and recruiting. Plaintiff West was unable to meet those sales and recruiting goals because Lia Sophia's announcement of its closure stymied future sales.

107. In 2014, Plaintiff West achieved goals that entitled her to select certain jewelry from Lia Sophia in the future at greatly discounted prices. But Lia Sophia never designed the jewelry. Plaintiff West was unable to select any of this jewelry because of Lia Sophia's closure. For example, Plaintiff West earned a starfish necklace as an incentive award in 2014. Lia Sophia never provided her with that award.

108. In 2014, Plaintiff West purchased supplies directly from Lia Sophia. Those supplies included catalogs, promotional jewelry, and order forms. Plaintiff West intended to use those supplies to continue selling additional Lia Sophia jewelry. Those supplies have no commercial use other than in connection with selling Lia Sophia jewelry. At the time Lia Sophia sold those supplies to Plaintiff West, Lia Sophia – including its owner KEC, and Tory and Elena Kiam – knew that Lia Sophia was going to close, which would render Plaintiff West unable to recoup those expenditures.

***Plaintiff Esposito's Experience***

109. Plaintiff Esposito sold Lia Sophia jewelry as a Sales Advisor from 2009 until Lia

Sophia terminated its sales force in December 2014.

110.    Through her own efforts and those of others she recruited, Plaintiff Esposito created a network of customers who purchased jewelry from Lia Sophia. Plaintiff Esposito cultivated those customers so that she could earn commissions on purchases those customers made from Lia Sophia.

111.    Lia Sophia subsequently has usurped the benefits of Plaintiff Esposito's efforts by selling jewelry directly to those customers. Plaintiff Esposito never gave Lia Sophia permission to market directly to her customers, or to use the customer information she had uploaded in Lia Sophia's ordering system.

112.    In 2014, Lia Sophia incentivized its sales force by offering certain jewelry promotions and trips based on specific sales and recruiting goals. Plaintiff Esposito attempted to achieve those incentives by arranging for parties, selling Lia Sophia jewelry and recruiting. Plaintiff Esposito was unable to meet those sales and recruiting goals because Lia Sophia's announcement of its closure stymied future sales.

113.    In 2014, Plaintiff Esposito achieved goals that entitled her to select certain jewelry from Lia Sophia in the future at greatly discounted prices. But Lia Sophia never designed the jewelry. Plaintiff Esposito was unable to select any of this jewelry because of Lia Sophia's closure.

114.    In 2014, Plaintiff Esposito purchased supplies directly from Lia Sophia. Those supplies included catalogs, promotional jewelry, and order forms. Plaintiff Esposito intended to use those supplies to continue selling additional Lia Sophia jewelry. Those supplies have no commercial use other than in connection with selling Lia Sophia jewelry. At the time Lia Sophia sold those supplies to Plaintiff Esposito, Lia Sophia – including its owner KEC, and Tory and Elena Kiam – knew that Lia Sophia was going to close, which would render Plaintiff Esposito

unable to recoup those expenditures.

**_Plaintiff Roman's Experience_**

115.    Plaintiff Roman sold Lia Sophia jewelry as a Sales Advisor for approximately ten years until Lia Sophia terminated its sales force in December 2014.

116.    Through her own efforts and those of others she recruited, Plaintiff Roman created a network of customers who purchased jewelry from Lia Sophia.  Plaintiff Roman cultivated those customers so that she could earn commissions on purchases those customers made from Lia Sophia.

117.    Lia Sophia subsequently has usurped the benefits of Plaintiff Roman's efforts by selling jewelry directly to those customers.  Plaintiff Roman never gave Lia Sophia permission to market directly to her customers, or to use the customer information she had uploaded in Lia Sophia's ordering system.

118.    In 2014, Lia Sophia incentivized its sales force by offering certain jewelry promotions and trips based on specific sales and recruiting goals.  Plaintiff Roman attempted to achieve those incentives by arranging for parties, selling Lia Sophia jewelry and recruiting. Plaintiff Roman was unable to meet those sales and recruiting goals because Lia Sophia's announcement of its closure stymied future sales.

119.    In 2014, Plaintiff Roman achieved goals that entitled her to select certain jewelry from Lia Sophia in the future at greatly discounted prices.  But Lia Sophia never designed the jewelry.  Plaintiff Roman was unable to select any of this jewelry because of Lia Sophia's closure.

120.    In 2014, Plaintiff Roman purchased supplies directly from Lia Sophia.  Those supplies included catalogs, promotional jewelry, and order forms.  Plaintiff Roman intended to use those supplies to continue selling additional Lia Sophia jewelry. Those supplies have no

commercial use other than in connection with selling Lia Sophia jewelry. At the time Lia Sophia sold those supplies to Plaintiff Roman, Lia Sophia – including its owner KEC, and Tory and Elena Kiam – knew that Lia Sophia was going to close, which would render Plaintiff Roman unable to recoup those expenditures.

121.    The Sales Advisor Class (defined below) has been damaged, *inter alia*, in the following ways:

   a.    The Sales Advisors purchased supplies and jewelry from Lia Sophia for use in selling Lia Sophia's jewelry, but have been precluded from selling Lia Sophia jewelry and thus have lost the value of those investments;

   b.    The Sales Advisors earned incentives that they were not paid;

   c.    The Sales Advisors developed networks of customers to whom they sold jewelry, and Lia Sophia has now usurped that network for its own ends by eliminating the Sales Advisors and selling directly to those customers; and

   d.    The Sales Advisors suffered reputational damage because of Lia Sophia's fraudulent actions.

***Plaintiff Zimmerman's Experience***

122.    Plaintiff Zimmerman was recruited by Plaintiff West. In October 2014, Plaintiff Zimmerman decided she would try to sell Lia Sophia jewelry.

123.    Plaintiff Zimmerman purchased her starter kit for $99 (after Lia Sophia dropped the price from $149 to $99) in October 2014.

124.    On October 22, 2014, Plaintiff Zimmerman received an email from Marcia Cota of Lia Sophia, which provided her with details of her "Smart Start" program and noted that she had submitted her starter show on October 22, 2014. The email set forth a weekly schedule for Plaintiff

Zimmerman to follow, culminating in having her "[r]ecruit a new Advisor" by December 19, 2014, and to "[s]tep up to leadership" by February 13, 2015.

125.    Plaintiff Zimmerman subsequently had an on-line flash party (via the website), and sold jewelry to two or three of her friends.

126.    Plaintiff Zimmerman scheduled her first show for December 6, 2014, to be hosted at the House of Hope charitable shelter.

127.    Following the surprise announcement on December 1, 2014 by Lia Sophia that it was closing, House of Hope informed Plaintiff Zimmerman that it could no longer host her show because they could not risk having their benefactors order jewelry and perhaps never receive it.

128.    Among other things, Plaintiff Zimmerman lost her investment in her starter kit, her time in putting together and scheduling a show, and the opportunity to have elected to sell for a different company or pursue another opportunity.  Had Plaintiff Zimmerman known that Lia Sophia was planning to close, she never would have purchased a starter kit, nor would she have become a Sales Advisor for Lia Sophia.

129.    The New Sales Advisor Class (defined below) has been damaged, *inter alia*, in the following ways:

    a.    The New Sales Advisors purchased starter kits and other supplies to be used to sell Lia Sophia jewelry, but were unable to use those starter kits and supplies because Lia Sophia terminated its Sales Advisors;

    b.    The New Sales Advisors invested time and energy in training, learning Lia Sophia's product line, and scheduling shows; and

    c.    The New Sales Advisors lost opportunities to invest their time and energy in viable businesses rather than Lia Sophia.

## V.    <u>CLASS ACTION ALLEGATIONS</u>

130.    Plaintiffs West, Roman and Esposito bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All individuals who sold jewelry for Lia Sophia (the "Sales Advisor Class").

Excluded from the Sales Advisor Class are Defendants, and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

131.    Plaintiff Zimmerman brings this action on behalf of herself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procure on behalf of a class defined as:

> All individuals who joined Lia Sophia as Sales Advisors in 2014 and purchased initial starter kits after May 31, 2014 (the "New Sales Advisor Class").

Excluded from the New Sales Advisor Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

132.    Plaintiffs Hollander and Ballon bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All individuals who purchased jewelry from Lia Sophia (the "Customer Class").

Excluded from the Customer Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

133. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

134. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all members of the Class is impracticable. There are thousands of consumers who have been damaged by Lia Sophia's wrongful conduct as alleged herein. There are likewise thousands of Sales Advisors and New Sales Advisors who have been damaged by Lia Sophia's conduct. The precise number of Class members and their addresses is presently unknown to Plaintiffs, but may be ascertained from Lia Sophia's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

135. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    (a)    Whether Lia Sophia offered a lifetime replacement guarantee on its jewelry;

    (b)    Whether Lia Sophia breached the contract of the terms of its sale with those customers that purchased products with lifetime replacement guarantees;

    (c)    Whether Lia Sophia continued to sell jewelry with a lifetime replacement guarantee while planning to close and repudiate the guarantee;

(d)     Whether Lia Sophia sold supplies and jewelry to its Sales Advisors while planning to close and subsequently precluded the Sales Advisors from recouping those expenditures;

(e)     Whether Lia Sophia unfairly usurped the customer networks developed by its Sales Advisors by firing its sale force and then directly soliciting those same customers;

(f)     Whether Plaintiff and Class members have been injured and the proper measure of their losses as a result of those injuries; and

(g)     Whether Plaintiff and the other Class members are entitled to injunctive or declaratory relief, and the nature of such relief.

136.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class members because, among other things, all Class members were comparably injured through the uniform misconduct described above.

137.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their respective interests do not conflict with the interests of the Class members they seek to represent; they have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

138.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Lia Sophia has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

139.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The

damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.     CLAIMS ALLEGED

### COUNT I
### Breach of Contract
### (On behalf of the Customer Class Against Lia Sophia)

140.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

141.    Plaintiffs Hollander and Ballon, and each member of the Customer Class, formed a contract with Lia Sophia at the time Plaintiffs and the other members of the Customer Class purchased jewelry with lifetime warranties. The terms of that contract include the promises and affirmations of fact made by Lia Sophia through its marketing, described above.

142.    The contract is a valid, enforceable contract supported by consideration. The product packaging and advertising constitute express warranties and became part of the basis of the bargain, on which Plaintiffs and the members of the Customer Class relied. These terms are part of a standardized contract between Plaintiffs and the members of the Customer Class on the one hand and Lia Sophia on the other.

143.   All conditions precedent to Lia Sophia's liability under this contract have been performed by Plaintiffs and the Class.

144.   Plaintiffs and each of the members of the Class are not in breach of the contracts.

145.   Lia Sophia breached the contracts by failing to honor its promise to replace the jewelry in the event the customer returned the jewelry.

146.   Lia Sophia further breached the contracts by repudiating the terms of the lifetime replacement guarantee, thereby diminishing the value of the jewelry.

147.   Lia Sophia also issued merchandise certificates to customers when it was unable to replace jewelry that had been returned by customers.  Lia Sophia further breached the contracts by retroactively voiding the merchandise certificates by unilaterally announcing the certificates would expire on December 28, 2014.  Similarly, Lia Sophia breached the contracts by not permitting customers to use the certificates or by refusing to accept the certificates for purchases on its website.

148.   Lia Sophia further breached the contracts by failing to ship jewelry that customers had purchased and paid for.

149.   As a result of Lia Sophia's breach of its contracts, Plaintiffs and the Customer Class have been damaged in an amount to be proven at trial, including but not limited to the amount of the purchase price of the jewelry that they purchased.

## COUNT II
**Violation of the Illinois Consumer Fraud Act**
**(On Behalf of the Customer Class Against Lia Sophia and Tory Kiam)**

150.   Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

151.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("ICFA"), prohibits the use of unfair or deceptive acts or practices in the conduct of trade or commerce.  The ICFA is to be liberally construed.

152.    Defendants engaged in the following unfair or deceptive acts or practices in the conduct of trade or commerce:

    a.  Lia Sophia sold its products with a lifetime replacement guarantee, yet it knew for those products it sold in 2014 that it would not honor the guarantee because it was going to close; and

    b.  Lia Sophia provided certificates to customers with six month expiration dates in lieu of product replacements, yet it knew it would not honor those certificates because it was either going to unilaterally declare the certificates expired or make it impossible for the customers to redeem the certificates.

153.    Lia Sophia intended for the Customer Class to rely upon its promises of a lifetime replacement guarantee.

154.    Lia Sophia sold its products to the Customer Class in trade or commerce within Illinois.  Lia Sophia's physical facility is located in Illinois, it made its representations (including the lifetime replacement guarantee) in Illinois, and it shipped its products from Illinois.

155.    Tory Kiam and Elena Kiam were officers of Lia Sophia and the owners of KEC. The Kiams controlled Lia Sophia and directed its activities, including the use of the lifetime replacement guarantee.  Tory Kiam made, or was involved in, every major decision effecting Lia Sophia's business, including the use of the lifetime replacement guarantee, the repudiation of that guarantee, the decision to terminate its Sales Advisors, the decision to close its business, the decision to keep secret from customers and Sales Advisors the upcoming closure of the business,

the decision to continue operating Lia Sophia via its internet presence, and the decision not to pay Sales Advisors commissions on direct internet sales.

156.    As a result of Defendants' use or employment of the aforementioned unfair deceptive acts or practices, Plaintiff and each of the other members of the Customer Class have sustained damages in an amount to be proven at trial.

157.    Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

**COUNT III**
**Common Law Fraud**
**(On Behalf of the Customer Class Against Lia Sophia and Tory Kiam)**

158.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

159.    Lia Sophia made several representations or material omissions that it knew to be false, including:

      a.  Lia Sophia sold its products with a lifetime replacement guarantee, yet it knew for those products it sold in 2014 that it would not honor the guarantee because it was going to close; and

      b.  Lia Sophia provided certificates to customers with six month expiration dates in lieu of product replacements, yet it knew it would not honor those certificates because it was either going to unilaterally declare the certificates expired or make it impossible for the customers to redeem the certificates.

160.    It was reasonable for Plaintiffs and the Customer Class to rely upon Lia Sophia's statements.

161.    Plaintiffs and the Customer Class relied upon Lia Sophia's statements in purchasing

the jewelry.

162.   Lia Sophia offered the lifetime replacement guarantee for the purpose of inducing Plaintiffs and the Customer Class to purchase Lia Sophia jewelry.

163.   Tory Kiam and Elena Kiam were officers of Lia Sophia and the owners of KEC. The Kiams controlled Lia Sophia and directed its activities, including the use of the lifetime replacement guarantee.  Tory Kiam made, or was involved in, every major decision effecting Lia Sophia's business, including the use of the lifetime replacement guarantee, the repudiation of that guarantee, the decision to terminate its Sales Advisors, the decision to close its business, the decision to keep secret from customers and Sales Advisors the upcoming closure of the business, the decision to continue operating Lia Sophia via its internet presence, and the decision not to pay Sales Advisors commissions on direct internet sales.

164.   As a result of Defendants' statements, Plaintiffs and each of the other members of the Customer Class have sustained damages in an amount to be proven at trial.

165.   Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

## COUNT IV
### Unjust Enrichment
### (In the alternative to Count I)
### (On behalf of the Customer Class Against Lia Sophia)

166.   Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

167.   Defendants sold the products based on untrue and misleading advertising, including failure to disclose material facts, as stated more fully above.   Specifically, Lia Sophia represented that its products contained a full lifetime replacement guarantee.

168.     By selling the products and not honoring the lifetime warranties as advertised, Lia Sophia received a benefit from Plaintiff and members of the Customer Class to which it was not entitled.

169.     Defendants knowingly appreciated and accepted this benefit, which resulted and continues to result in an inequity to Plaintiff and all members of the Customer Class.

170.     Defendants' retention of such benefit violates the fundamental principles of justice, equity, and good conscience.

171.     As a result of Defendants' unjust enrichment, Plaintiff and members of the Customer Class sustained damages in an amount to be determined at trial.  Plaintiff seeks full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## COUNT V
### Violation of the Illinois Consumer Fraud Act
#### (On Behalf of the Sales Advisor Class Against Lia Sophia and Tory Kiam)

172.     Plaintiffs West, Esposito, and Roman re-allege and incorporate by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

173.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("ICFA"), prohibits the use of unfair or deceptive acts or practices in the conduct of trade or commerce.  The ICFA is to be liberally construed.

174.     Defendants engaged in the following unfair or deceptive acts or practices in the conduct of trade or commerce:

   a.   Lia Sophia sold supplies and jewelry to its Sales Advisors in order for the Sales Advisors to sell Lia Sophia's products, yet it knew it was going to close and those

Sales Advisors would never recoup their expenditures in those supplies and jewelry;

b. Lia Sophia continued to encourage its Sales Advisors to make sales and recruit new advisors, and offered future incentives for doing so, yet it knew it was going to close and would never provide those incentives;

c. Lia Sophia had always sold its jewelry through its Sales Advisors, and had assured its Sales Advisors that it would never bypass them and sell directly to the customers acquired by the Sales Advisors, yet Lia Sophia did precisely that starting in December 2014; and

d. Lia Sophia took the customer information provided by the Sales Advisors in the course of fulfilling customer orders, and used that customer information to compete directly against its Sales Advisors starting in January 2015.

175. Lia Sophia intended for the Plaintiffs and the Sales Advisor Class to rely upon its promises.

176. Lia Sophia sold its products to the Sales Advisor Class in trade or commerce within Illinois. Lia Sophia's physical facility is located in Illinois, it made its representations (including the lifetime replacement guarantee) in Illinois, and it shipped its products from Illinois.

177. Tory Kiam and Elena Kiam were officers of Lia Sophia and the owners of KEC. The Kiams controlled Lia Sophia and directed its activities, including the use of the lifetime replacement guarantee. Tory Kiam made, or was involved in, every major decision effecting Lia Sophia's business, including the use of the lifetime replacement guarantee, the repudiation of that guarantee, the decision to terminate its sales advisors, the decision to close its business, the decision to keep secret from customers and Sales Advisors the upcoming closure of the business,

the decision to continue operating Lia Sophia via its internet presence, and the decision not to pay commissions to its Sales Advisors for direct internet sales.

178.    As a result of Defendants' use or employment of the aforementioned unfair deceptive acts or practices, Plaintiffs and each of the other members of the Sales Advisor Class have sustained damages in an amount to be proven at trial.

179.    Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

**COUNT VI**
**Common Law Fraud**
**(On Behalf of the Sales Advisor Class Against Lia Sophia and Tory Kiam)**

180.    Plaintiffs West, Esposito and Roman re-allege and incorporate by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

181.    Lia Sophia made several representations or material omissions that it knew to be false, including:

    a.  Lia Sophia sold supplies and jewelry to its Sales Advisors in order for the Sales Advisors to sell Lia Sophia's products, yet it knew it was going to close and those Sales Advisors would never recoup their expenditures in those supplies and jewelry;

    b.  Lia Sophia continued to encourage its Sales Advisors to make sales and recruit new advisors, and offered future incentives for doing so, yet it knew it was going to close and would never provide those incentives;

    c.  Lia Sophia had always sold its jewelry through its Sales Advisors, and had assured its Sales Advisors that it would never bypass them and sell directly to the customers

acquired by the Sales Advisors, yet Lia Sophia did precisely that starting in January 2015; and

    d.    Lia Sophia took the customer information provided by the Sales Advisors in the course of fulfilling customer orders, and used that customer information to compete directly against its Sales Advisors starting in December 2014.

182.    It was reasonable for Plaintiffs and the Sales Advisor Class to rely upon Lia Sophia's statements.

183.    Plaintiffs and the Sales Advisor Class relied upon Lia Sophia's statements in purchasing the jewelry.

184.    Tory Kiam and Elena Kiam were officers of Lia Sophia and the owners of KEC. The Kiams controlled Lia Sophia and directed its activities, including the use of the lifetime replacement guarantee. Tory Kiam made, or was involved in, every major decision effecting Lia Sophia's business, including the use of the lifetime replacement guarantee, the repudiation of that guarantee, the decision to terminate its sales advisors, the decision to close its business, the decision to keep secret from customers and Sales Advisors the upcoming closure of the business, the decision to continue operating Lia Sophia via its internet presence, and the decision not to pay Sales Advisors commissions on direct internet sales.

185.    As a result of Defendants' statements, Plaintiffs and each of the other members of the Sales Advisor Class have sustained damages in an amount to be proven at trial.

186.    Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

## COUNT VII
### Unjust Enrichment
### (On behalf of the Sales Advisor Class Against Lia Sophia)

187.     Plaintiffs West, Esposito and Roman re-allege and incorporate by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

188.     Defendant sold the supplies and jewelry to the Sales Advisor Class based on untrue and misleading advertising, including failure to disclose material facts, as stated more fully above. Specifically, Lia Sophia implied that it would continue to operate while it was in the process of selling supplies and jewelry to the Sales Advisor Class. Lia Sophia, and Tory Kiam, also specifically assured the Sales Advisor Class that Lia Sophia would never bypass the Sales Advisors and sell directly to customers.

189.     By selling the supplies and jewelry to the Sales Advisors, and by selling jewelry directly to customers, Lia Sophia received a benefit from Plaintiff and Sales Advisor Class members to which it was not entitled.

190.     Lia Sophia also took the customer information that its Sales Advisors had entered into the Lia Sophia sales system in order to place customer orders, and Lia Sophia used that customer information to compete directly against its Sales Advisors starting in January 2015. Lia Sophia had no right to this customer information, and had repeatedly promised, via Tory Kiam, that it would not compete directly against its Sales Advisors.

191.     Specifically, Lia Sophia is not entitled to: (a) money paid for jewelry and supplies that Lia Sophia knew, at the time of sale, could not be sold or used due to Lia Sophia's pending closure; (b) the work of Sales Advisors, including Plaintiffs, on the promise of incentives Lia Sophia promised while knowing it would never provide them and/or such Sales Advisors could never earn due to Lia Sophia's pending closure; (c) customers (and related beneficial sales data)

developed by Sales Advisors and usurped by Lia Sophia; and (d) revenue from customers Lia Sophia acquired from Sales Advisors.

192.     Defendant knowingly appreciated and accepted these benefits, which resulted and continues to result in an inequity to Plaintiffs and all members of the Sales Advisor Class.

193.     Defendant's retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

194.     As a result of Defendant's unjust enrichment, Plaintiffs and all members of the Sales Advisor Class sustained damages in an amount to be determined at trial.  Plaintiffs seek full disgorgement and restitution of Defendant's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## COUNT VIII
### Violation of the Illinois Consumer Fraud Act
### (On Behalf of the New Sales Advisor Class Against Lia Sophia and Tory Kiam)

195.     Plaintiff Zimmerman re-alleges and incorporates by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

196.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("ICFA"), prohibits the use of unfair or deceptive acts or practices in the conduct of trade or commerce.  The ICFA is to be liberally construed.

197.     Defendants engaged in the following unfair or deceptive acts or practices in the conduct of trade or commerce:

>     a.    Lia Sophia recruited and enrolled the New Sales Advisors to sell Lia Sophia's products; implicit in that recruitment was that Lia Sophia planned to continue in business as it had for the previous 27 years, yet Lia Sophia management and Tory Kiam knew Lia Sophia was going to close and those New Sales Advisors would

never recoup their expenditures in the time, training, planning and purchase of supplies and jewelry that the New Sales Advisors made;

b. Lia Sophia provided written schedules and offered future incentives to the New Sales Advisors, yet Lia Sophia management and Tory Kiam knew Lia Sophia was going to close and the New Sales Advisors would never be able to follow the schedules or obtain the incentives;

c. Lia Sophia induced the New Sales Advisors to sign contracts with Lia Sophia and to forego other business opportunities to join Lia Sophia, yet Lia Sophia management and Tory Kiam knew Lia Sophia was going to close.

198.  Lia Sophia and Tory Kiam intended for the Plaintiffs and the New Sales Advisor Class to rely upon Lia Sophia's promises.

199.  Lia Sophia sold its products to the New Sales Advisor Class in trade or commerce within Illinois. Lia Sophia's physical facility is located in Illinois, it made its representations (including the lifetime replacement guarantee) in Illinois, and it shipped its products from Illinois.

200.  Tory Kiam personally directed Lia Sophia's strategy, and made the decision to have Lia Sophia continue to recruit and accept New Sales Advisors, while knowing that Lia Sophia was going to close and terminate its sales advisors. Tory Kiam made the decision not to tell New Sales Advisors of Lia Sophia's planned closure.

201.  As a result of Defendants' use or employment of the aforementioned unfair deceptive acts or practices, Plaintiffs and each of the other members of the New Sales Advisor Class have sustained damages in an amount to be proven at trial.

202.  Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

## COUNT IX
## Common Law Fraud
### (On Behalf of the New Sales Advisor Class Against Lia Sophia and Tory Kiam)

203.    Plaintiff Zimmerman re-alleges and incorporates by reference the allegations contained in paragraphs 1 to 139 above as if fully set forth herein.

204.    Defendants made several representations or material omissions that they knew to be false, including:

    a.   Lia Sophia recruited and enrolled the New Sales Advisors to sell Lia Sophia's products; implicit in that recruitment was that Lia Sophia planned to continue in business as it had for the previous 27 years, yet Lia Sophia management and Tory Kiam knew Lia Sophia was going to close and those New Sales Advisors would never recoup their expenditures in the time, training, planning and purchase of supplies and jewelry that the New Sales Advisors made;

    b.   Lia Sophia provided written schedules and offered future incentives to the New Sales Advisors, yet Lia Sophia management and Tory Kiam knew Lia Sophia was going to close and the New Sales Advisors would never be able to follow the schedules or obtain the incentives;

    c.   Lia Sophia induced the New Sales Advisors to sign contracts with Lia Sophia and to forego other business opportunities to join Lia Sophia, yet Lia Sophia management and Tory Kiam knew Lia Sophia was going to close.

205.    Lia Sophia and Tory Kiam intended for the Plaintiff and the New Sales Advisor Class to rely upon Lia Sophia's promises and conduct.

206.    It was reasonable for Plaintiff and the New Sales Advisor Class to rely upon Lia Sophia's promises and conduct.

207.    Tory Kiam personally directed Lia Sophia's strategy, and made the decision to have Lia Sophia continue to recruit and accept New Sales Advisors, while knowing that Lia Sophia was going to close and terminate its sales advisors. Tory Kiam made the decision not to tell New Sales Advisors of Lia Sophia's planned closure.

208.    As a result of Defendants' false statements and material omissions, Plaintiff and each of the other members of the New Sales Advisor Class have sustained damages in an amount to be proven at trial.

209.    Defendants' conduct showed malice, evil motive, or the reckless disregard for the rights of others such that an award of punitive damages is appropriate.

## VII.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## VIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Classes proposed in this Complaint, respectfully request that the Court enter an Order awarding the following relief:

(a)     Certifying this action as a class action; designating Plaintiffs as Representatives for their respective classes; and appointing the undersigned as Class Counsel;

(b)     Awarding compensatory and actual damages, including restitution and disgorgement of Defendants' revenues to Plaintiffs and the other Class members generated from the unlawful practices set forth herein;

(c)     Enjoining Defendants from continuing the unlawful practices set forth herein;

(d)     Awarding attorneys' fees and costs to Plaintiffs and the other members of the Classes; and

(e)     Such other and further relief as the Court deems just and proper.

Dated:  November 30, 2016                    Respectfully submitted,


                                             By:___/s/ Todd L. McLawhorn_____

                                             Joseph J. Siprut
                                             *jsiprut@siprut.com*
                                             Todd L. McLawhorn
                                             *tmclawhorn@siprut.com*
                                             **SIPRUT PC**
                                             17 North State Street
                                             Suite 1600
                                             Chicago, Illinois 60602
                                             Phone: 312.236.0000
                                             Fax: 312.754.9616
                                             **www.siprut.com**


                                             *Attorneys for Plaintiffs*
                                             *And the Proposed Putative Classes*

# EXHIBIT 1

8110030890 RR Donnelley ©2012. All rights reserved. DRC - 0667

1B ☐    1A ☐

# lia sophia

SHARE THE LOVE OF JEWELRY®

## customer selection ticket
(You will receive your Proof of Purchase along with your jewelry order.)

Advisor name _____

/ /
Show date

Advisor number _____    phone _____

Customer # (must be filled in)

Hostess _____

phone _____

☐ I'm interested in booking a
**lia sophia® Show.**

☐ I'd like to learn more about a
career with **lia sophia**

Customer _____

daytime phone _____

e-mail _____

address _____

city _____

state _____    zip _____

All orders are accepted and shipped by
**lia sophia** from its Roselle, IL processing center.

| REGULAR PRICE PURCHASES | | please print clearly | |
|---|---|---|---|
| STYLE NUMBER | SIZE | NAME/DESCRIPTION | PRICE |
| 23224 | | Flicker Pink | 24 00 |
| 23286 | | Cumulus | 26 00 |
| 32 | | | |
| | | | |
| | | | |
| | | | |
| **TOTAL REGULAR PRICE PURCHASES** | | | |
| **LESS MERCHANDISE CERTIFICATE BEING REDEEMED** | | | |
| | | **TOTAL REGULAR PRICE PURCHASES MINUS CERTIFICATE** | |

| HALF PRICE PURCHASES | | | | |
|---|---|---|---|---|
| CO. USE ONLY | STYLE NUMBER | SIZE | NAME/DESCRIPTION | PRICE |
| H | 32464 | | Cumulus | 22 |
| H | 63629 | 7 | Greek Isle | 34 |
| H | | | | |
| H | | | | |
| H | | | | |
| **TOTAL HALF PRICE PURCHASES** | | | | |

## LIFETIME REPLACEMENT GUARANTEE
(Proof of Purchase Required)

At **lia sophia®**, Customer satisfaction is our No. 1 priority. To ensure that we always exceed your expectations, we offer a full Lifetime Replacement Guarantee. Merchandise must be purchased through an authorized representative of **lia sophia** for this guarantee to apply. Because the guarantee is offered by **lia sophia**, ALL returns or exchanges MUST be handled through the company and NOT the Advisor. Shipping charges are not refundable, and refunds are not available after 45 days from original Show ship date. Jewelry may be returned for replacement due to a manufacturer's defect, with your original Customer Purchase Receipt/proof of purchase. Return shipping is at the Customer's expense. Jewelry returned within 120 days will be replaced at no charge. If your original selection is no longer available, you will receive a merchandise certificate. After 120 days, please add a $5 PER ITEM handling charge. Lifetime Replacement Guarantee does not cover lost jewelry.

| | |
|---|---|
| **LESS MERCHANDISE CERTIFICATE BEING REDEEMED** | 106 99 |
| **TOTAL HALF PRICE PURCHASES MINUS CERTIFICATE** | |
| **TOTAL PURCHASES** | 113 42 |
| **SHIPPING** (TAXABLE IN SOME STATES) | 4 25 |
| **ADD SALES TAX _____ %** (WE DO NOT ACCEPT TAX EXEMPT ORDERS) | |
| **TOTAL DUE** | 117 67 |

## NOTICE OF CANCELLATION *(required by Federal Trade Commission)*

You may cancel this order within three business days* from the date of transaction. If you cancel, you must make available to **lia sophia** any goods delivered to you under the terms of this sale, in substantially as good condition as when received. If you wish, you may comply with **lia sophia's** instructions regarding any return shipment of products at the seller's expense and risk. If you do make the products available to **lia sophia** and **lia sophia** does not pick them up within 20 days of the date of your notice of cancellation, you may retain or dispose of the products without further obligation under the terms of the sale. To cancel this transaction, please call your Advisor within three business days* of the date of purchase.

*Five business days in Alaska. Fifteen business days for persons 65+ in North Dakota.

Our jewelry is not intended for children under 13 years of age.

**FOR RETURNS/EXCHANGES:**
1620 Central Avenue        www.liasophia.com
Roselle, IL 60172          (800) 959-3324

credit card number

If a mathematical error occurs, the Company is authorized to adjust the charge amount indicated to prepay the order.

exp. date    $ amount

cardholder signature _____

○ VISA
○ MasterCard
○ ___ ___

Advisor copy

70S754301

# EXHIBIT 2

# EXCHANGE FORM
## CUSTOMER PURCHASE RECEIPT (REVERSE SIDE)

*Save your receipt to validate guarantee*

**lia sophia**
SHARE THE LOVE OF JEWELRY®

For current rates and most up-to-date form, check www.liasophia.com

**At lia sophia®, Customer satisfaction is our No. 1 priority.** We offer a full Lifetime Replacement Guarantee. Merchandise must be purchased through an authorized representative of lia sophia for this guarantee to apply. ALL returns or exchanges MUST be handled through the company and NOT the Advisor. Shipping charges are not refundable, and cash refunds are not available after 45 days from original Show ship date.

- Jewelry may be returned for replacement due to a manufacturer's defect, with your original Customer Purchase Receipt/proof of purchase (reverse side). Return shipping is at the Customer's expense.
- Jewelry returned within 120 days will be replaced at no charge.
- After 120 days, please add a $5 PER ITEM handling charge.
- If your original selection is no longer available, you will receive a merchandise certificate equal to the retail value at time of purchase.
- Merchandise certificate received for a returned item will expire 6 months from the date issued.
- Lifetime Replacement Guarantee does not cover lost jewelry.

**1** **Complete this Exchange Form**

If you wish to return or exchange any portion of your order, please complete this form and include it with your return shipment. Send to:

lia sophia
attn: Exchanges
1620 Central Avenue
Roselle IL 60172-1602

**2** **Pack and Return**

Send the item(s) along with this completed original Customer Purchase Receipt and Exchange Form and any monies due. To ensure we receive complete exchange packages, we recommend using a padded envelope or box. Please use correct postage to avoid your package being returned to you for insufficient postage. lia sophia is not responsible for lost mail. Allow 2-3 weeks for processing.

| Advisor name | Advisor number | original order number | date of Show |
|---|---|---|---|

**REASON CODES:**
1. Broken
4. Missing/Defective stone
2. Wrong item / size ordered
5. Defective finish
3. Incorrect item / size received
6. Not as pictured / expected
7. Other _____

**Please list items being returned under the appropriate replacement action.**

**REPLACE**
with SAME item only
(note: rings and bracelets may be exchanged for another size)

| Style Number | Current Size | New Size | Name/Description | Reason Code | How Purchased Reg | Half | Other | Price |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

*add $5 (or current rate) per item processing fee after 120 days of purchase.* **TOTAL HANDLING FEE** **A**

**MERCHANDISE CERTIFICATE**
Certificates are for merchandise only and cannot be used to pay fees, taxes or shipping charges owed. Certificates may be redeemed as follows: at www.liasophia.com or through your authorized Advisor's personal website.

| Style Number | Current Size | New Size | Name/Description | Reason Code | How Purchased Reg | Half | Other | Price |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

*add $5 (or current rate) per item processing fee after 120 days of purchase.* **TOTAL HANDLING FEE** **B**

**REFUND**
NOT available after 45 days from original order / Show ship date.

| Style Number | Current Size | New Size | Name/Description | Reason Code | How Purchased Reg | Half | Other | Price |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

**TOTAL RETURNED ITEMS**

**TOTAL PROCESSING FEES A + B**

name _____
address _____
city _____ state ____ zip ____
phone _____
email _____

**Check one (Please do not send cash):** ☐ check ☐ credit card

credit card number _____

exp. date ____ $ amount ____

*If a mathematical error occurs, the Company is authorized to adjust the charge amount indicated to prepay the order.*

cardholder signature _____

○ VISA
○ MasterCard
○ DISCOVER NOVUS

**Keep a copy of the original Customer Purchase Receipt for your records. The Customer Selection Ticket received at the time of order cannot be used as the Purchase Receipt.**

© 2013 lia sophia. All rights reserved. • 13597_0113

Customer Service 1 800 959 3324   www.liasophia.com