**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA WEST, KRISTINE HOLLANDER, JENNIFER ZIMMERMAN, MARY ROMAN, MARIE ESPOSITO, and MICHELLE BALLON, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| | ) | Case No. 1:15-cv-05569 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Hon. Thomas M. Durkin |
| ACT II JEWELRY, LLC, a Delaware limited liability corporation d/b/a lia sophia, and VICTOR K. KIAM, III, | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MOTION FOR
<u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

<u>Submitted by:</u>

Joseph J. Siprut
*jsiprut@siprut.com*
Todd L. McLawhorn
*tmclawhorn@siprut.com*
Ke Liu
*kliu@siprut.com*
**SIPRUT PC**
17 N. State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.878.1342

***Counsel for Plaintiffs
and the Settlement Classes***

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION .............................................................................................................1

BACKGROUND ..............................................................................................................2

ARGUMENT ...................................................................................................................6

I.     COMPONENTS OF THE SETTLEMENT ...................................................6

        A.  The Settlement Classes ......................................................................6

        B.  Benefit To Settlement Class Members .............................................7

        C.  Incentive Awards To Class Representatives....................................10

        D.  Attorneys' Fees And Costs ..............................................................11

II.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED
      BECAUSE IT MEETS ALL THE REQUIREMENTS OF RULE 23 ............................12

        A.  Numerosity – F.R.C.P. 23(a) ............................................................13

        B.  Commonality/Predominance – F.R.C.P. 23(a)(2) and 23(b)(3)............................14

        C.  Typicality – F.R.C.P. 23(a)(3) .........................................................17

        D.  Adequacy Of Representation – F.R.C.P. 23(a)(4) ...........................19

        E.  Superiority – F.R.C.P. 23(b)(3) .......................................................20

III.   THE PROPOSED SETTLEMENT IS FAIR
      AND SHOULD RECEIVE FINAL APPROVAL ...........................................21

        A.  Strength Of The Case Measured Against The Settlement ...................................22

        B.  The Complexity, Length, And Expense Of Continued Litigation ........................25

        C.  The Settlement Classes' Reaction And Lack Of Opposition To The Settlement ..25

        D.  Class Counsel's Opinion...................................................................27

        E.  The Stage Of The Proceedings And The Amount Of Discovery Completed .......27

IV.   THE COURT-APPROVED NOTICE PROGRAM SATIFIES DUE PROCESS............29

V.    THE OBJECTIONS TO THE SETTLEMENT SHOULD BE OVERRULED ...............30

        A.  Objector Christine Pierce ................................................................30

        B.  Objector Cara Menz .........................................................................31

CONCLUSION ..............................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agee v. E.E.O.C.,*
    478 U.S. 1004 (1986) ................................................................................................... 22

*Am. Civil Liberties Union of Ill. v. U.S. Gen. Servs. Admin.,*
    235 F. Supp. 2d 816 (N.D. Ill. 2002) ......................................................................... 22

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ....................................................................................... 12, 13, 20

*Arenson v. Bd. of Trade of City of Chi.,*
    372 F. Supp. 1349 (N.D. Ill. 1974) ..................................................................... 12, 33

*Armstrong v. Bd. Of Sch. Dirs. Of the City of Milwaukee,*
    616 F.2d 305 (7th Cir. 1980) ....................................................................................... 21

*Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.,*
    747 F.3d 489 (7th Cir. 2014) ....................................................................................... 13

*Briggs v. PNC Fin. Servs. Grp., Inc.,*
    No. 15-cv-10447, 2016 WL 7018566 (N.D. Ill. Nov. 29, 2016) .................................. 32

*Butler v. Sears, Roebuck & Co.,*
    727 F.3d 796 (7th Cir. 2013) ....................................................................................... 16

*Carnegie v. Household Int'l, Inc.,*
    376 F.3d 656 (7th Cir. 2004) ....................................................................................... 20

*Carson v. Am. Brands, Inc.,*
    450 U.S. 79 (1981) ....................................................................................................... 22

*Cifuentes v. CEVA Logistics U.S., Inc.,*
    No. 16-cv-1957, 2017 WL 4792425 (S.D. Cal. Oct. 23, 2017) .................................... 12

*DiGiacomo v. Plains All Am. Pipeline,*
    No. H-99-4137, 2001 WL 34633373 (S.D. Tex. Dec. 19, 2001) .................................... 12

*Du Puy v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor,*
    519 F.2d 536 (7th Cir. 1975) ....................................................................................... 21

*E.E.O.C. v. Hiram Walker & Sons, Inc.,*
    768 F.2d 884 (7th Cir. 1985) ....................................................................................... 22

*Fletcher v. ZLB Behring LLC,*
    245 F.R.D. 328 (N.D. Ill. 2006) ................................................................ 16

*Garcia v. J.C. Penny Corp.,*
    No. 12-cv-3687, 2017 WL 3449077 (N.D. Ill. Aug. 9, 2017) .......................... 32

*Gehrich v. Chase Bank USA, N.A.,*
    No. 12 C 5510, 2016 WL 806549 (N.D. Ill. Mar. 2, 2016) ........................... 13, 16, 26, 28

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.,*
    128 F.3d 1074 (7th Cir. 1997) ................................................................... 21

*Gomez v. Ill. State Bd. of Educ.,*
    117 F.R.D. 394 (N.D. Ill. 1987) ................................................................. 19

*Hinman v. M & M Rental Ctr., Inc.,*
    545 F. Supp. 2d 802 (N.D. Ill. 2008) ......................................................... 19

*Hispanics United of DuPage Cty. v. Vill. Of Addison, Ill.,*
    988 F. Supp. 1130 (N.D. Ill. 1997) ............................................................ 21

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.,*
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ....................................................... 26, 31

*In re Bluetooth Headset Prods. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) .................................................................... 33

*In re Capital One Tel. Consumer Prot. Litig.,*
    80 F. Supp. 3d 781 (N.D. Ill. 2015) ........................................................ 26, 27

*In re Cenco, Inc. Secs. Litig.,*
    519 F. Supp. 322 (N.D. Ill. 1981) .......................................................... 11, 33

*In re Charter Comm's., Inc. Sec. Litig.,*
    No. MDL 1506, 2005 WL 4045741 (E.D. Mo. June 30, 2005) ........................ 12

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,*
    80 F. Supp. 3d 838 (N.D. Ill. 2015) ........................................................... 33

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ........................................................................ 34

*In re Mexico Money Transfer Litig.,*
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) ........................................................ 26

iii

*In re Mexico Money Transfer Litig.*,
    267 F.3d 743 (7th Cir. 2001) ..................................................... 26

*In re Neopharm, Inc. Secs. Litig.*,
    225 F.R.D. 563 (N.D. Ill. 2004)................................................. 17

*In re Rite Aid Corp. Sec. Litig.*,
    362 F. Supp. 2d 587 (E.D. Penn. 2005) .................................... 12

*In re Sw. Airlines Voucher Litig.*,
    No. 11 C 8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013).................................... 26, 31

*In re Sw. Airlines Voucher Litig.*,
    799 F.3d 701 (7th Cir. 2015) ..................................................... 26

*In re Synthroid Marketing Litig.*,
    188 F.R.D. 287 (N.D. Ill. 1999).................................................. 17

*In re: Cathode Ray Tube (Crt) Antitrust Litig.*,
    MDL No. 1917, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016) ......................................... 30

*Ira Holtzman, C.P.A. v. Turza*,
    728 F.3d 682 (7th Cir. 2013) ..................................................... 16

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ................................................. 21, 22

*Kaufman v. Am. Express Travel Related Servs., Co.*,
    No. 07-CV-1707, 2016 WL 806546 (N.D. Ill. Mar. 2, 2016).................................... 11, 32

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483 (N.D. Ill. 2015)......................................... 17, 27, 30

*Livaditis v. Rosario*,
    506 U.S. 1051 (1993)................................................................ 14

*Marcial v. Coronet Ins. Co.*,
    880 F.2d 954 (7th Cir. 1989) ..................................................... 13

*Maxwell v. Arrow Fin. Servs., LLC*,
    No. 03 C 1995, 2004 WL 719278 (N.D. Ill. Mar. 31, 2004) ........................................ 13

*McCulloch v. Baker Hughes Inteq Drilling Fluids, Inc.*,
    No. 16-cv-157, 2017 WL 5665848 (E.D. Cal. Nov. 27, 2017)........................................ 12

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ........................................................................ 20

*Patterson v. Gen. Motors Corp.*,
    631 F.2d 476 (7th Cir. 1980) ........................................................................ 14

*Patterson v. Gen. Motors Corp.*,
    451 U.S. 914 (1980) ...................................................................................... 14

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ........................................................................ 33

*Pope v. Harvard Banchares, Inc.*,
    240 F.R.D. 383 (N.D. Ill. 2006) .................................................................... 14

*Radmanovich v. Combined Ins. Co. of Am.*,
    216 F.R.D. 424 (N.D. Ill. 2003) .................................................................... 17

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ................................................................. 11, 35

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ...................................................................... 14

*Scholes v. Stone, McGuire, & Benjamin*,
    143 F.R.D. 181 (N.D. Ill. 1992) .................................................................... 14

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ........................................... 11, 27, 28, 32

*Slaughter v. Wells Fargo Advisors, LLC*,
    No. 13-cv-6368, 2017 WL 3128802 (N.D. Ill. May 4, 2017) ........................ 32

*Smith v. Nike Retail Servs., Inc.*,
    234 F.R.D. 648 (N.D. Ill. 2006) .................................................................... 13

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ........................................................................ 34

*Swanson v. Am. Consumer Indus., Inc.*,
    415 F.2d 1326 (7th Cir. 1969) ...................................................................... 14

*Swift v. Direct Buy, Inc.*,
    No. 11-cv-401, 2013 WL 5770633 (N.D. In. Oct. 24, 2013) ........................ 30

*Szabo v. Bridgeport Machines, Inc.*,
    249 F.3d 672 (7th Cir. 2001) ................................................................. 13

*Toney v. Rosewood Care Ctr., Inc. of Joliet*,
    No. 98 C 0693, 1999 WL 199249 (N.D. Ill. Mar. 31, 1999) ........................... 17

*Van Vranken v. Atl. Richfield Co.*,
    901 F. Supp. 294 (N.D. Cal. 1995) ....................................................... 12

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ..................................................................... 15

*Whitten v. ARS Nat'l Servs. Inc.*,
    No. 00 C 6080, 2001 WL 1143238 (N.D. Ill. Sept. 27, 2001) ........................ 15

*Wong v. Accretive Health, Inc.*,
    773 F.3d 859 (7th Cir. 2014) .......................................................... 21, 22

*Young v. Cty. of Cook*,
    No. 06-cv-552, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017) ........................ 32

**Statutes and Rules**

Fed. R. Civ. P. 23 ........................................................................ *passim*

**Other Authorities**

Alba Conte, ATTORNEY FEE AWARDS (2d ed. 1993) ................................. 12

Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS (4th ed. 2002) ............. 13, 14

MANUAL FOR COMPLEX LITIGATION (Fourth) (2004) ................................ 28

Pursuant to Fed. R. Civ. P. 23, Plaintiffs, Cynthia West ("West"), Kristine Hollander ("Hollander"), Jennifer Zimmerman ("Zimmerman"), Mary Roman ("Roman"), Marie Esposito ("Esposito"), and Michelle Ballon ("Ballon") (collectively, the "Plaintiffs"), submit this Motion For Final Approval Of Class Action Settlement. For the reasons detailed below, Plaintiffs respectfully request that the Court enter an Order granting final approval of the class action settlement as fair, reasonable, and adequate.

## INTRODUCTION

Defendants Act II Jewelry, LLC ("Act II") and Victor K. Kiam, III ("Victor Kiam") (collectively, the "Defendants") and Plaintiffs have entered into a Settlement Agreement (the "Settlement Agreement" or "Settlement") in the above-referenced matter (attached hereto as Exhibit 1). The Settlement Agreement—a product of over two years of litigation, extensive discovery, and four mediations—settles the dispute relating to Plaintiffs' claims of Defendants' breach of contract, violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), fraud and unjust enrichment.

The cornerstone of the Settlement is the substantial, concrete monetary relief it provides for Settlement Class Members. The Settlement establishes an "all-in," non-reversionary, common fund in the amount of *$6,700,000*—cash (the "Settlement Fund"). The Settlement encompasses three Classes, all of which will receive substantial monetary payments as detailed *infra*. The Settlement also provides for the best practicable notice to the Class Members by a reputable and competent professional Settlement Administrator, Heffler Claims Group LLC (the "Settlement Administrator"). Indeed, the Class' enthusiastic response underscores the importance of this Settlement—nearly *160,000* claims have been filed. Moreover, this Settlement has received only

a 0.003% opt-out rate, and merely *two* objections. In sum, the Settlement is fair, adequate, and reasonable, and should now receive final approval.

## **BACKGROUND**

Act II did business as lia sophia, and sold costume jewelry to consumers through a party planning method that utilized sales advisors who sold jewelry at parties hosted for that purpose, similar to the method used by Avon and Tupperware. Act II generally sold its full-price jewelry with a lifetime replacement guarantee. On December 1, 2014, Act II announced that it would wind down its direct sales business, including fulfillment of claims under the lifetime replacement guarantee, by the end of the year. As a result, purchasers of Act II's jewelry would no longer receive the benefit of the lifetime replacement guarantee.

On June 23, 2015, Plaintiffs West and Hollander brought a putative class action against Act II, Kiam Equities Corporation ("Kiam Equities"), Victor K. Kiam, III, and Elena Kiam, in the United States District Court for the Northern District of Illinois (the "Court"), case number 15-cv-5569. (Dkt. No. 1.) Plaintiffs West and Hollander alleged breach of contract, violation of the ICFA, common law fraud, and unjust enrichment against these Defendants for revoking the lifetime warranties on their jewelry, and for making material misrepresentations or omissions to its sales advisors by inducing them to continue working as sales advisors; this included the purchase of supplies and jewelry from the Defendants, even though the Defendants knew the sales advisors would not be able to recoup those expenditures because Defendants had planned to close the business at least six months prior to making the announcement. (*Id.* at ¶¶72-128.)

On October 19, 2015, the Parties held a mediation with Retired District Judge James F. Holderman in Chicago, Illinois. (Declaration of Todd L. McLawhorn ("McLawhorn Decl."), attached hereto as Exhibit 2, ¶5.) Prior to the mediation, the Parties engaged in limited discovery

and exchanged written mediation statements summarizing their respective positions concerning the factual and legal issues in the litigation. (*Id*.) This mediation did not result in settlement. (*Id.*)

Following the mediation, the Defendants moved to dismiss the case on multiple grounds. (Dkt. No. 35.) After full briefing before the Court, on March 18, 2016, the Court denied Act II's motion but granted the remaining Defendants' motion, dismissing Kiam Equities Corporation, Victor Kiam, and Elena Kiam from the litigation. (Dkt. No. 58.) Act II also filed an answer denying all material allegations, along with affirmative defenses. (Dkt. No. 34.) The parties then engaged in discovery.

Between April 2016 and April 2017, the Parties engaged in multiple rounds of written and electronic discovery regarding the claims and defenses in this litigation. (McLawhorn Decl. ¶7.) Although the Parties produced and analyzed a substantial number of documents, discovery in the case was significantly complicated by the wind-down and closure of Act II's active business. Nevertheless, discovery was extensive, as it involved: (a) review of 12,267 pages of documents produced by Plaintiffs; (b) review of 20,111 pages of documents produced by Act II; (c) review of documents produced by Victor Kiam; (d) review of documents produced by Kiam Equities; (e) review of documents produced by Elena Kiam; (f) review of several thousand pages of documents produced by eight different third parties subpoenaed by Plaintiffs in addition to computer media provided by those third parties; (g) the preparation for taking and/or defending the depositions of approximately ten fact witnesses from Act II and various third-parties; and (h) the preparation for taking and/or defending the depositions of the six Class Representatives. In addition, Class Counsel interviewed over twenty putative class members from the three classes as part of their discovery efforts in the case and evaluated that evidence for both class certification and merits purposes. (*Id.*)

While discovery was ongoing, on November 30, 2016, Plaintiffs filed their First Amended Class Action Complaint (the "First Amended Complaint"), alleging claims for breach of contract, violation of the ICFA, fraud and unjust enrichment. (Dkt. No. 75.) The First Amended Complaint added four new class representatives – Plaintiffs Zimmerman, Roman, Esposito, and Ballon – and sought to represent a third putative class – all individuals who joined Act II as sales advisors in 2014 and who purchased initial starter kits after May 31, 2014. (*Id.* at ¶¶12-15, 132.) Plaintiffs' First Amended Complaint also re-named Victor Kiam as a co-Defendant. (*Id.* at ¶17.) Plaintiffs sought to represent three separate classes with three distinct types of claims: (1) approximately 15,000-20,000 former Act II sales advisors whose customer information had been utilized by Act II to compete against them in Act II's post-closing sell-off of over $11 million of inventory; (2) approximately four million customers who had purchased jewelry within the past four to five years whose jewelry was no longer guaranteed to be replaced upon return; and (3) approximately 1,000-2,000 new sales advisors who joined Act II while, unbeknownst to those new sales advisors, Act II was planning on closing. (*Id.* at ¶¶130-139.) On December 20, 2016, Defendants filed their Answer to Plaintiffs' First Amended Complaint and denied all material allegations. (Dkt. No. 77.)

Following the filing of the First Amended Complaint, the Parties continued to engage in discovery. In the spring of 2017, Defendants deposed three of the Class Representatives. (McLawhorn Decl. ¶9.) Following those depositions, the Parties resumed settlement discussions and engaged in three separate, extensive mediations over the course of approximately four months. (*Id.* at ¶10.) As a result of those continued discussions and mediations, on July 17, 2017, during a mediation before Judge Holderman (the fourth mediation in this litigation), the Parties agreed to a settlement in principal. (*Id.*) A Settlement Term Sheet was subsequently executed on August 1, 2017. (*Id.*)

During August and September 2017, Class Counsel worked extensively with the Settlement Administrator to analyze confirmatory class data in order to: (a) finalize the terms of the Settlement; and (b) structure a notice plan consistent with Fed. R. Civ. P. 23(c)(2)(B). (*Id.* at ¶11.) In September 2017, after several exchanges of drafts and edits, and numerous conference calls, the Parties agreed to the form and content of the Settlement Agreement, which was executed in November 2017. (*Id.*)

On November 21, 2017, Plaintiffs moved for Preliminary Approval of Class Action Settlement (Dkt. No. 93), which the Court approved during the motion hearing on November 29, 2017 (Dkt. No. 97). The next day, the Court issued the written preliminary approval order. (Dkt. No. 98).[1]

Subsequently, Class Counsel has worked with the Settlement Administrator to finalize the notice plan and to effectuate notice. (McLawhorn Decl. ¶14.) The three classes contain nearly four million class members (the classes are not mutually exclusive; some individuals are members of two classes), and the notice plan was designed to reach all members. Pursuant to the Court's Order, the Settlement Administrator began the notice campaign on January 8, 2018, with publication notice via Internet banners and via Act II's social media webpages. (Declaration of Jonathan Shaffer, ("Shaffer Decl."), attached hereto as Exhibit 3, ¶8.) In addition, the Settlement Website was brought online, which provided detailed information to class members. (*Id.* at ¶19.) On the same day, the Settlement Administrator sent direct notice via email to all Class Members for whom the Settlement Administrator was able to determine an email address based on the transaction records provided by Act II. (*Id.* at ¶10.) On January 23, 2018, the Settlement Administrator sent

---

[1] Due to a minor clerical error, the Preliminary Approval Order was subsequently amended on December 6, 2017. (Dkt. No. 99.)

direct notice via U.S. mail to all Class Members for whom the Settlement Administrator was unable to determine an email address, and for all Class Members for whom the email notice had bounced. (*Id.* at ¶13.)

As of May 23, 2018, the Settlement Administrator has received 158,066 valid and timely claims. (*Id.* at ¶22.) Further, the Settlement Administrator has also received 159 valid but late claims, for a total of 158,225 valid claims. (*Id.*) Because this small number of late claims will *not* significantly impact each Class Members' individual recovery, Class Counsel recommends that these late but otherwise valid claims be approved.[2] The Settlement Administrator has also received 114 timely requests for exclusion, and two objections have been filed with the Court. (*Id.* at ¶¶24-25.)[3]

In addition, on March, 23, 2018, Plaintiffs submitted their Motion For Attorneys' Fees, Costs, And Incentive Awards. (Dkt. No. 103.) This Settlement is now poised for final approval.

## ARGUMENT

## I.       COMPONENTS OF THE SETTLEMENT.

### A.       The Settlement Classes.

The three Settlement Classes provisionally certified by this Court on December 6, 2017, are defined as:

1.       ***Customer Class*** – All individuals in the United States who purchased jewelry from Defendant Act II Jewelry, LLC between June 23, 2011, and December 1, 2014.

---

[2] All mathematical calculations pertaining to class relief have been calculated by the Settlement Administrator with the presumption that the Court approves the 159 late but otherwise valid claims.

[3] The Settlement Administrator has also received 1,918 deficient claims, and has sought further documentation from these claimants. (Shaffer Decl. ¶22.) Should some of these claimants cure the deficiencies in their claims, the Settlement Administrator does not expect these claims to materially impact the Class Members' individual recoveries.

2. ***Sales Advisor Class*** – All individuals in the United States who sold at least $250 of jewelry for Defendant Act II Jewelry, LLC between January 1, 2014, and August 17, 2014.

3. ***New Sales Advisor Class*** – All individuals in the United States who purchased initial starter kits from Defendant Act II Jewelry, LLC between August 1, 2014, and December 1, 2014.

Specifically excluded from all three Classes are the following persons: (a) Defendants and their respective affiliates; (b) Class Counsel and their immediate family members; and (c) the judges who have presided over this litigation and their immediate family members. (Dkt. No. 99 at p. 2.)

Based on analysis of the discovery and confirmatory data provided by Defendants, the Customer Class contains approximately 3,930,219 individuals; the Sales Advisor Class contains approximately 19,069 individuals; and the New Sales Advisor Class contains approximately 2,709 individuals. (Shaffer Decl. ¶¶4-6.) Membership amongst the Classes is not mutually exclusive; certain individuals are eligible to become members of multiple Classes and receive multiple forms of relief as detailed below.

**B. Benefits To Settlement Class Members.**

The Settlement establishes an all-in, non-reversionary Settlement Fund of $6,700,000 ***cash***, to provide relief for the Class Members as well as pay for settlement administration expenses, Class Counsel's attorneys' fees and costs, and Plaintiffs' incentive awards. First, the Settlement Fund will be used to pay for settlement administration expenses ($1,300,000), resulting in a remaining $5,400,000 (the "Net Settlement Fund"). Plaintiffs then seek an attorneys' fees award not exceeding one-third of the Net Settlement Fund ($1,800,000), unreimbursed litigation costs ($24,349.02), and incentive awards for the six Class Representatives ranging from $2,500 to

$10,000 (totaling $27,500). (*See* Dkt. No. 103.) This results in an estimated fund of ***$3,548,150.98 cash*** to provide relief for the Classes (the "Class Fund").

The Settlement will provide the following relief for Class Members:[4]

- ***Customer Class.*** Fifty-seven percent (57%) of the Class Fund (approximately $2,022,446.06) is allocated to the Customer Class (the "Customer Class Fund"). (Shaffer Decl. ¶20.) In addition, $74,749.53 of the New Sales Advisor Class Fund has been reallocated to the Customer Class Fund (there was extra money in that fund based on the claims rate), for a total of $2,097,195.59. (*Id.* at ¶21.)

  Each Customer Class Member who submitted a Valid Claim form shall be placed in one of three "Tiers" depending on the amount of jewelry they purchased from Act II between June 23, 2011, and December 1, 2014. Each Customer Class Member who submitted a Valid Claim form and purchased less than $100 of jewelry will be placed into Tier One and will receive the same amount as each other Customer Class Member in Tier One – *i.e.* a *pro rata* distribution. Each Customer Class Member who submitted a Valid Claim form and purchased between $100 and $299.99 of jewelry will be placed into Tier Two and will receive double the amount received by each Customer Class Member in Tier One. Each Customer Class Member who submitted a Valid Claim form and purchased $300 or more in jewelry will be placed into Tier Three and will receive triple the amount received by each Customer Class Member in Tier One. Customer Class Members who wished to challenge their Tier designation were able to do so by submitting evidence to the Settlement Administrator.

  After conducting an accounting, the Settlement Administrator has determined that 154,383 valid and timely claims, and 135 valid but late claims, were submitted for the Customer Class. Assuming the Court approves the valid but late claims, the Settlement Administrator has determined the following benefit breakdown:

|        | Number of Valid Claims Submitted | Settlement Benefit |
|--------|:--------------------------------:|:------------------:|
| Tier 1 | 74,009                           | $8.19              |
| Tier 2 | 59,476                           | $16.38             |
| Tier 3 | 21,033                           | $24.57             |

  (Shaffer Decl. ¶22.)

---

[4] All figures have been calculated assuming that the Court awards the proposed settlement administration expenses, attorneys' fees, unreimbursed litigation costs, and incentive awards, as requested by Plaintiffs and Class Counsel.

- ***Sales Advisor Class.*** Thirty-eight percent (38%) of the Class Fund (approximately $1,348,297.37) is allocated to the Sales Advisor Class (the "Sales Advisor Class Fund"). (Shaffer Decl. ¶20.) In addition, $49,833.02 of the New Sales Advisor Class Fund has been reallocated to the Sales Advisor Class Fund (there was extra money in that fund based on the claims rate), for a total of $1,398,130.39. (*Id.* at ¶21.)

  Each Sales Advisor Class Member who submitted a Valid Claim will receive a *percentage* of the amount of sales made by that Sales Advisor Class Member between January 1, 2014, and August 17, 2014. This percentage is dependent on the number of Sales Advisor Class Members that submit Valid Claims—*i.e.* a *quasi-pro rata* distribution.

  After an accounting, the Settlement Administrator has determined that 3,260 Sales Advisors have submitted valid and timely claims, and 22 Sales Advisors have submitted valid but late claims. Assuming the Court approves the valid but late claims, the Sales Advisor Class Fund will provide each Class Member a settlement benefit equal to 6.12% of their sales between January 1, 2014, and August 17, 2014. (Shaffer Decl. ¶22.) This translates to payments of $15.30 to $7,453.37, with an average payment of $426 and a median payment of $151.63. (*Id.*)

- ***New Sales Advisor Class.*** Five percent (5%) of the Class Fund (approximately $177,407.55) is allocated to the New Sales Advisor Class (the "New Sales Advisor Class Fund"). (Shaffer Decl. ¶20.) Each New Sales Advisor Class Member who submits a Valid Claim form shall receive a full reimbursement for the cost of his or her initial starter kit, which ranged from $99 to $149. (*Id.* at ¶22.)

  In the event the number of Valid Claims for New Sales Advisor Class Members exhausts the amount allocated to the New Sales Advisor Class, each New Sales Advisor who submits a Valid Claim will have his or her benefit reduced proportionally so that the total benefit to the New Sales Advisor Class does not exceed five percent (5%) of the Class Fund. In the event that there is money remaining in the New Sales Advisor Class Fund after payment of benefits to all New Sales Advisor Class Members who submit Valid Claims, the remainder shall be reallocated back to the Class Fund and distributed to the Customer Class and the Sales Advisor Class in the same proportion as other funds distributed to those Classes, as described above.

  After an accounting, the Settlement Administrator has determined that 423 New Sales Advisors have submitted valid and timely claims, and 2 New Sales Advisors have submitted valid but late claims. (Shaffer Decl. ¶22.) Assuming the Court approves the valid but late claims, the New Sales Advisor Class Fund totals $52,825 in settlement benefits, which represents

-9-

a full reimbursement for each claiming New Sales Advisor's starter kit (ranging from $99 to $149). This results in $124.582.55 left over in the New Sales Advisor Class Fund. (*Id.* at ¶21.) Pursuant to the Settlement, $74,749.53 has been reallocated to the Customer Class Fund, and $49,833.02 has been reallocated to the Sales Advisor Class Fund. (*Id.*)

- **No Reversion.** No amount of the Settlement Fund shall revert back to Defendants. Settlement Class Members' uncashed checks shall be awarded to a *cy pres* recipient to be determined by the Court.

In sum, the Settlement has been designed to afford relief to as many Class Members as possible. And it has—each of the three Settlement Classes are able to obtain substantial monetary benefits from this Settlement. Assuming the Court approves the valid but late claims, each Customer Class Member that submitted a Valid Claim will receive $8.19 (Tier One), $16.38 (Tier Two), or $24.57 (Tier Three); each Sales Advisor Class Member that submitted a Valid Claim will receive 6.12% of their sales from January 1, 2014, to August 17, 2014, which translates to payments ranging from $15.30 to $7,453.37, with an average payment of $426 and a median payment of $151.63; and each New Sales Advisor Class Member that submitted a Valid Claim will receive a full refund of their new starter kit, ranging from $99 to $149. (Shaffer Decl. ¶22.) In total, nearly *160,000* individuals will receive relief from this Settlement. (*Id.*) Indeed, the success of this Settlement is underscored by the Class' enthusiastic response—a claims rate of 3.92% of the Customer Class; 16.84% of the Sales Advisor Class; and 15.58% of the New Sales Advisor Class. (*Id.* at ¶23.) Simply put, Class Counsel believes this is an outstanding result.

## C. Incentive Awards To Class Representatives.

Subject to Court approval, Plaintiffs request service awards ranging from $2,500 to $10,000 (totaling $27,500 for all six named Plaintiffs) in recognition of their contributions to the Class, the time they spent assisting with the prosecution of this case, and the risks they incurred in commencing the action, both financial and otherwise. Support for Plaintiffs' request for the

proposed incentive awards is detailed in Plaintiffs' Motion For Attorneys' Fees, Costs, And Incentive Awards (Dkt. No. 103).

### D. Attorneys' Fees And Costs.

Class Counsel requests total fees in the amount of one-third of the Net Settlement Fund, which is the Settlement Fund after deduction of settlement administration expenses. Assuming the Court awards settlement administration expenses of $1,300,000, this request amounts to attorneys' fees of $1,800,000. In addition, Class Counsel should be reimbursed for its out-of-pocket litigation expenses of $24,349.02. Support for Class Counsel's request for the proposed attorneys' fees and costs, including details regarding the substantial amount of work that went into this case, is detailed in Plaintiffs' Motion For Attorneys' Fees, Costs, And Incentive Awards (Dkt. No. 103).

It is important to note however, that there is no agreement amongst the parties as to fees—*i.e.* no "clear-sailing" provision—consistent with recent Seventh Circuit jurisprudence. *Redman v. RadioShack Corp.*, 768 F.3d 622, 637 (7th Cir. 2014). Furthermore, the amount requested is in line with the ratio articulated by the Seventh Circuit in *Redman*, which assesses the reasonableness of attorneys' fees in comparison to the class' benefit: "(1) the fee to (2) the fee plus what the class members received." 768 F.3d at 630. Here, the *Redman* ratio is 33.6% ($1,800,000 / ($1,800,000 + $3,548,150.98)), which is precisely in line with other recent cases in this District. *See, e.g., Kaufman v. Am. Express Travel Related Servs., Co.*, No. 07-CV-1707, 2016 WL 806546, at *13 (N.D. Ill. Mar. 2, 2016) (Gottschall, J.) (awarding fees with a *Redman* ratio of 34.8%).

In addition, the requested attorneys' fees of $1,800,000 reflects a mere 1.7 multiplier on Class Counsel's base lodestar ($1,038,402). (*See* Dkt. No. 103 at pp. 11.) Courts have approved multipliers of up to and beyond four (4). *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 (N.D. Ill. 2011) (multiplier of 2.5); *In re Cenco, Inc. Secs. Litig.*, 519 F. Supp. 322, 327

(N.D. Ill. 1981) (multipliers of 4 and 2); *Arenson v. Bd. of Trade of City of Chi.,* 372 F. Supp. 1349, 1359 (N.D. Ill. 1974) (multiplier of 4); *McCulloch v. Baker Hughes Inteq Drilling Fluids, Inc.,* No. 16-cv-157, 2017 WL 5665848, at *8 (E.D. Cal. Nov. 27, 2017) (multiplier of 3.95); *Cifuentes v. CEVA Logistics U.S., Inc.,* No. 16-cv-1957, 2017 WL 4792425, at *7 (S.D. Cal. Oct. 23, 2017) (multiplier of 3); *see also Van Vranken v. Atl. Richfield Co.,* 901 F. Supp. 294, 298 (N.D. Cal. 1995) ("Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation.") (citation omitted); Alba Conte, ATTORNEY FEE AWARDS § 2.06, at 39 (2d ed. 1993) ("When a large common fund has been recovered and the hours are relatively small, some courts reach a reasonable fee determination based on large multipliers of 5 or 10 times the lodestar.").[5] Given the inherent risks of this case, Class Counsel's fee request is well within reason.

## II.     THE SETTLEMENT CLASS SHOULD BE CERTIFIED BECAUSE IT MEETS ALL THE REQUIREMENTS OF RULE 23.

To certify a class under Rule 23, the Court must find that the proposed class meets the elements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2) or (3). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997) ("In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."). "Settlement is relevant to class certification" and is "a factor in the calculus." *Id.* at 619, 622. Indeed, the Supreme Court "has expressly approved the use of the class settlement device." *Id.* at 618. In this case, Plaintiffs seek certification of the Settlement Classes under Rule 23(b)(3), which requires that (i) the questions of law or fact common to all class members predominate over issues affecting only individual members, and (ii) the maintenance of a class

---

[5] *See also In re Rite Aid Corp. Sec. Litig.,* 362 F. Supp. 2d 587, 589 (E.D. Penn. 2005) (multiplier of 6.96); *DiGiacomo v. Plains All Am. Pipeline,* No. H-99-4137, 2001 WL 34633373, at *10-11 (S.D. Tex. Dec. 19, 2001) (multiplier of 5.3); *In re Charter Comm's., Inc. Sec. Litig.,* No. MDL 1506, 2005 WL 4045741, at *18 (E.D. Mo. June 30, 2005) (multiplier of 5.61).

action be superior to other available methods for the fair and efficient adjudication of the controversy. *Id.* at 615; *Szabo v. Bridgeport Machines, Inc*., 249 F.3d 672, 676 (7th Cir. 2001). Plaintiffs request that the Court, for the purposes of settlement, certify the Settlement Classes as defined *supra*. Each of the proposed Settlement Classes meet the requirements of Rules 23(a) and (b), and therefore, certification is appropriate.

### A.     Numerosity – Federal Rule Of Civil Procedure 23(a).

Rule 23(a)'s first requirement, numerosity, is satisfied where "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). There is neither a specific number required to satisfy this requirement, nor is a plaintiff required to state the exact number of potential class members. *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006) ("[A] plaintiff need not identify each class member or even provide an exact number of class members to satisfy that element.") (citing *Marcial v. Coronet Ins. Co.*, 880 F.2d 954 (7th Cir. 1989)); Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 7.20, 66 (4th ed. 2002). Instead, courts are permitted "to make common-sense assumptions that support a finding of numerosity." *Maxwell v. Arrow Fin. Servs., LLC*, No. 03 C 1995, 2004 WL 719278, at *2 (N.D. Ill. Mar. 31, 2004). "[A] class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). "Although no magic number exists for satisfying the numerosity requirement, the Seventh Circuit has held that '[e]ven if the class were limited to 40 [members] … that is a sufficiently large group to satisfy Rule 23(a) where the individual members of the class are widely scattered and their holdings are generally too small to warrant undertaking individual actions.'" *Gehrich v. Chase Bank USA, N.A.*, No. 12 C 5510, 2016 WL 806549, at *4 (N.D. Ill. Mar. 2, 2016)

(Feinerman, J.) (quoting *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n. 9 (7th Cir. 1969)); *Pope v. Harvard Banchares, Inc*., 240 F.R.D. 383, 387 (N.D. Ill. 2006) (granting class certification, distinguishing that "impracticable" does not mean "impossible," but rather extremely difficult and inconvenient).

Here, the Settlement Agreement comprises three Classes. There are 3,930,219 individuals in the Customer Class, 19,069 individuals in the Sales Advisor Class, and 2,709 individuals in the New Sales Advisor Class. (Shaffer Decl. ¶¶4-6.)[6] Accordingly, the Classes easily satisfy the numerosity requirement. *See* NEWBERG ON CLASS ACTIONS § 3:5, 243-46 (4th ed. 2002) ("Class actions under the amended Rule 23 have frequently involved classes numbering in the hundreds, or thousands . . . In such cases, the impracticability of bringing all class members before the court has been obvious, and the Rule 23(a)(1) requirement has been easily met.").

## B. Commonality/Predominance – Federal Rule Of Civil Procedure 23(a)(2) and 23(b)(3).

The commonality element requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Courts recognize that there may be factual differences between class members, but "factual variations among class members' claims" do not themselves "defeat the certification of a class." *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992) (citing *Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 481 (7th Cir. 1980), *cert. denied*, 451 U.S. 914 (1980)), *cert. denied*, 506 U.S. 1051 (1993). In fact, the threshold for commonality is not high. *Scholes v. Stone, McGuire, & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992) (granting class certification, characterizing the commonality requirement as "a low hurdle" easily surmounted). Rather, commonality exists if a common nucleus of operative fact exists, even if as to one question

---

[6] Membership amongst the Classes is not mutually exclusive, and certain individuals are eligible to become members of multiple Classes and receive multiple forms of relief. However, this does not affect numerosity, as the size of each individual Class alone suffices for numerosity.

of law or fact. *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011) ("[C]ommonality requires that the claims of the class simply "depend upon a common contention . . . of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."); *Whitten v. ARS Nat'l Servs. Inc.*, No. 00 C 6080, 2001 WL 1143238, *3 (N.D. Ill. Sept. 27, 2001) (commonality is often found where "Defendants have engaged in standardized conduct toward the members of the proposed class").

Here, the Settlement Classes share numerous common questions of fact and law that predominate over issues affecting only individual Settlement Class Members. Those common factual and legal issues include:

- **The Customer Class**

  a.   Whether Defendant Act II offered a lifetime replacement guarantee on its jewelry;

  b.   Whether Defendant Act II breached the contract of the terms of its sale with those customers that purchased products with lifetime replacement guarantees;

  c.   Whether Defendant Act II continued to sell jewelry with a lifetime replacement guarantee while planning to close and repudiate the guarantee; and

  d.   Whether Plaintiffs Hollander, Ballon, and the Customer Class, were injured by Defendants' conduct, and the proper measure of their losses as a result of those injuries.

- **The Sales Advisor Class**

  a.   Whether Defendants sold supplies and jewelry to their Sales Advisors, and encouraged their Sales Advisors to purchase supplies and jewelry, while planning to close and subsequently precluded the Sales Advisors from recouping those expenditures;

  b.   Whether Defendants actively concealed that they were closing from their Sales Advisors;

      c.      Whether Defendants unfairly usurped the customer networks developed by their Sales Advisors by firing these Sales Advisors upon closing the business, and then directly soliciting those same customers; and

      d.      Whether Plaintiffs West, Esposito, Roman, and the Sales Advisor Class, were injured by Defendants' conduct, and the proper measure of their losses as a result of those injuries.

- **The New Sales Advisor Class**

      a.      Whether Defendants sold initial starter kits to New Sales Advisors, and encouraged New Sales Advisors to purchase initial starter kits, while planning to close and subsequently precluded the New Sales Advisors from recouping those expenditures;

      b.      Whether Defendants actively concealed the fact that they were closing from the New Sales Advisors; and

      c.      Whether Plaintiff Zimmerman and the New Sales Advisor Class were injured by Defendants' conduct, and the proper measure of their losses as a result of those injuries.

Additionally, Rule 23(b)(3) provides that a class action may be maintained where the questions of law and fact common to members of the proposed class predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3); *Fletcher v. ZLB Behring LLC,* 245 F.R.D. 328, 331-32 (N.D. Ill. 2006); *Chase Bank*, 2016 WL 806549 at *5 (N.D. Ill. Mar. 2, 2016) ("A proposed class satisfies Rule 23(b)(3) if 'the questions of law or fact common to class members predominate over any questions affecting only individual members . . . .'") (citation omitted).

"Predominance . . . is a question of efficiency." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013). In this case, common questions predominate for the Settlement Class because Defendants' alleged unlawful conduct presents common questions with regard to all proposed Settlement Class Members. *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir.

2013); *In re Synthroid Marketing Litig.,* 188 F.R.D. 287, 292 (N.D. Ill. 1999) (acknowledging that plaintiff's allegations of defendant's standardized conduct involved "'a common course of conduct that leads to injury of all the class members.'") (quoting *Toney v. Rosewood Care Ctr., Inc. of Joliet,* No. 98 C 0693, 1999 WL 199249, at *9 (N.D. Ill. Mar. 31, 1999)). Defendants' alleged unlawful conduct – its sale of jewelry with lifetime warranties to the Customer Class, and its sale of supplies and jewelry to the Sales Advisor Class and the New Sales Advisor Class – presents common questions with regard to Defendants' intentions with regard to closing down its business. Defendants' liability depends on whether Defendants sold the jewelry and supplies despite knowing that: (a) customers would not be able to utilize the lifetime guarantee; and (b) sales advisors would not be able to recoup their expenditures. Thus, in the context of the proposed class-wide settlement, the predominance requirement is satisfied because liability and damages would have been decided predominantly, if not entirely, based on common evidence of Defendants' conduct.

### C.      Typicality – Federal Rule Of Civil Procedure 23(a)(3).

Rule 23 also requires that a plaintiff's claims be typical of other class members' claims. Fed. R. Civ. P. 23(a)(3). The typicality requirement is closely related to the commonality requirement and is satisfied if the plaintiff's claims arise from "the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 432 (N.D. Ill. 2003) (internal quotations omitted). The existence of factual differences will not preclude a finding of typicality. *Id.* "Typicality does not mean identical, and the typicality requirement is liberally construed." *In re Neopharm, Inc. Secs. Litig.*, 225 F.R.D. 563, 566 (N.D. Ill. 2004) (citation omitted); *Kolinek v. Walgreen Co.,* 311 F.R.D. 483, 491 (N.D. Ill. 2015) ("Typicality is satisfied when the named

plaintiff's claim and those of the class members have a common legal theory, even if there are some factual variations.").

Here, Plaintiffs Hollander, Ballon and the Customer Class allege that they purchased jewelry from Act II that was accompanied by a lifetime guarantee. (Dkt. No. 75, ¶¶95-101) Plaintiffs Hollander, Ballon, and the Customer Class allege that they were similarly injured by Act II when Act II later unilaterally revoked the lifetime guarantee. (*Id.*) Therefore, Plaintiffs Hollander and Ballon's claims are typical of those of the Customer Class.

Similarly, Plaintiffs West, Esposito, Roman and the Sales Advisor Class allege that they worked as Sales Advisors for Act II, and continued to purchase jewelry and supplies from Act II based on Defendants' representations and omissions that Act II was doing business as usual and had no plans to close. (*Id.* at ¶¶102-121.) Plaintiffs West, Esposito, Roman, and the Sales Advisor Class were similarly harmed by Defendant Act II when it suddenly ceased operations and usurped their customer lists. (*Id.*) Therefore, Plaintiffs West, Esposito, and Roman's claims are typical of those of the Sales Advisor Class.

Finally, Plaintiff Zimmerman and the New Sales Advisor Class allege that they purchased initial starter kits from Act II based on Defendants' representations and omissions that Act II would continue to operate and had no plans to close. (*Id.* at ¶¶122-129.) Plaintiff Zimmerman and the New Sales Advisor Class were similarly harmed by Defendant Act II when it suddenly ceased operations. (*Id.*) Therefore, Plaintiff Zimmerman's claims are typical of those of the New Sales Advisor Class.

Accordingly, the claims of each Class Representative is typical of the Class she seeks to represent. Moreover, there are no defenses that pertain to Plaintiffs that would not also pertain to their respective Settlement Classes.

**D.      Adequacy Of Representation – Federal Rule Of Civil Procedure 23(a)(4).**

The final Rule 23(a) prerequisite requires that a proposed class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy the adequacy requirement, class representatives must establish that they: "(1) [have] a sufficient stake in the outcome to ensure zealous advocacy, and [have] no claims antagonistic to or conflicting with the claims of other class members, and (2) [are] represented by qualified, experienced counsel." *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008). Furthermore, proposed class counsel must be competent and have the resources necessary to sustain the complex litigation necessitated by class claims; it is persuasive evidence that proposed class counsel have been found adequate in prior cases. *Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987) (finding class counsel was adequate, stating if "attorneys have been found to be adequate in the past, it is persuasive evidence that they will be adequate again.").

Here, Plaintiffs' interests are consonant with the interests of the Settlement Classes— obtaining relief from Defendants for their alleged unlawful conduct in revoking the lifetime guarantees on their products and suddenly shutting down operations precluding sales advisors from recouping their expenditures. Plaintiffs have no interests antagonistic to the interests of the other Settlement Class Members. (McLawhorn Decl. ¶16.) Moreover, Plaintiffs' counsel are well respected members of the legal community, have regularly engaged in major complex litigation, and have significant experience in consumer class actions involving similar issues, scope, and complexity. (*Id.* ¶17; Siprut Firm Resume (attached as Exhibit A to the McLawhorn Decl.).) Accordingly, Plaintiffs and their counsel would adequately represent the proposed Classes.

### E. Superiority – Federal Rule Of Civil Procedure 23(b)(3).

In addition to satisfying Rule 23(a), a plaintiff seeking certification must satisfy one of the provisions of Rule 23(b). Rule 23(b)(3) provides that matters pertinent to a finding of superiority include: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3). When settling a class action, Plaintiff does not have to prove manageability under Rule 23(b)(3) as if the case were being fully litigated because settlement may "eliminate all the thorny issues that the court would have to resolve if the parties fought out the case." *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 660 (7th Cir. 2004) (citing *Amchem,* 521 U.S. at 620).

The present class action is superior to other available methods for the fair and efficient adjudication of Plaintiffs' and the other Settlement Class Members' claims. The burden and expense of individual prosecution of the litigation necessitated by Defendants' actions makes a class action superior to other available methods of resolution. Absent a class action, it would be difficult, if not impossible, for individual members of the Class to obtain effective relief. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015) ("[I]n cases involving relatively low-cost goods or services . . . the class device is often essential 'to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'") (quoting *Amchem*, 521 U.S. at 617). In sum, the Settlement Classes meet the requirements of Rule 23(a) and 23(b)(3) and should be certified.

### III.  THE PROPOSED SETTLEMENT IS FAIR
### AND SHOULD RECEIVE FINAL APPROVAL.

Both judicial and public policies strongly favor the settlement of class action litigation. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996); *Armstrong v. Bd. Of Sch. Dirs. Of the City of Milwaukee,* 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."); *Du Puy v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor,* 519 F.2d 536, 541 (7th Cir. 1975) ("[G]eneral policy is in favor of settlement of litigation by compromise and settlement procedures"). Courts look upon the settlement of lawsuits with favor because such settlements promote "the interests of litigants by saving them the expense and uncertainties of trial, as well as the interests of the judicial system by making it unnecessary to devote public resources to disputes that the parties themselves can resolve with a mutually agreeable outcome." *Hispanics United of DuPage Cty. v. Vill. Of Addison, Ill.*, 988 F. Supp. 1130, 1149 (N.D. Ill. 1997). Indeed, compromise is particularly appropriate in complex class action cases. *See id.*

In determining whether a district court should exercise its discretion to approve a class settlement as "fair," the Seventh Circuit has explained that district courts should "consider the facts in the light most favorable to the settlement," *Isby*, 75 F.3d at 1199 (citing *Armstrong*, 616 F.2d at 315), and has identified several factors for analyzing whether a class action settlement should be given final approval including: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997) (affirming

finding that settlement was fair under similar six-factor analysis); *Am. Civil Liberties Union of Ill. v. U.S. Gen. Servs. Admin.*, 235 F. Supp. 2d 816, 818 (N.D. Ill. 2002) (same). All of these factors weigh in favor of final approval of this Settlement.

### A. Strength Of The Case Measured Against The Settlement.

"The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Wong*, 773 F.3d at 864. The Supreme Court has cautioned, however, that in reviewing a proposed class settlement, a court should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) ("The district court should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights"), *cert. denied*, 478 U.S. 1004 (1986); *Isby*, 75 F.3d at 1196-97 (declining objecting members' invitation to determine merits of legal issues that remain unresolved, stating this was a "necessary consequence of settlement"). Instead, a court's inquiry should be "limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Isby*, 75 F.3d at 1196. Likewise, the Seventh Circuit has urged district courts to be mindful that "[t]he essence of settlement is compromise," so "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial." *Hiram Walker*, 768 F.2d at 889 (emphasis original). Indeed, a district court should not reject a settlement "solely because [the settlement] does not provide a complete victory to the plaintiffs." *Isby*, 75 F.3d at 1200.

Plaintiffs Hollander and Ballon allege that Defendants breached their contracts, violated the ICFA, committed common law fraud, and were unjustly enriched by failing to honor their promise of lifetime warranties on the jewelry they sold and by unilaterally repudiating the terms

of the lifetime replacement guarantee, even though Defendants knew they would not honor the lifetime guarantee upon closure of their business. (Dkt. No. 75, ¶¶140-171.) Plaintiffs Hollander and Ballon therefore claim that they, and the Customer Class, have sustained damages through the diminished value of the jewelry they purchased. (*Id.*)

Plaintiffs West, Esposito, and Roman allege that Defendants violated the ICFA, committed common law fraud, and were unjustly enriched by continuing to encourage their Sales Advisors to purchase jewelry from Act II, by assuring their Sales Advisors that they would never bypass them and sell directly to the customers, and by taking their Sales Advisors' customer information and using it to compete against them. (*Id.* at ¶¶172-194.) Plaintiffs West, Esposito, and Roman therefore claim that they, and the Sales Advisor Class, have sustained damages through their reliance on Defendants' statements in continuing to work and purchase jewelry and supplies as Act II Sales Advisors. (*Id.*)

Plaintiff Zimmerman alleges that Defendants violated the ICFA and committed common law fraud by encouraging New Sales Advisors to purchase initial starter kits, even though Defendants knew the New Sales Advisors would never recoup their expenditures because Act II was going to close its business. (*Id.* at ¶¶195-209.) Plaintiff Zimmerman therefore claims that she, and the New Sales Advisor Class, have sustained damages through their reliance on Defendants' statements in purchasing their initial starter kits and by Defendants' abrupt closure of business. (*Id.*)

Defendants deny liability and assert several defenses that would defeat Plaintiffs' claims on both substantive and procedural grounds. With respect to the Customers, Defendants contend that the lifetime warranty was expressly limited only to manufacturers' defects, that breach of contract claims are not actionable under the ICFA, that most customers – including the relevant

named Plaintiffs – had no breach of warranty claim because they never attempted to return their jewelry, and that determining whether each customer tried and failed to return jewelry with a manufacturer's defect is an individualized question not suitable for class treatment.

With respect to the Sales Advisors and New Sales Advisors, Defendants contend that the Advisors expressly waived their right to participate in class actions pursuant to the terms of their contracts, that Sale Advisors had no right to continue as sales advisors after their agreements were terminated, that  Sales Advisor claims were defeated by their contracts, that Act II had a right to contact its own customers, that the Sales Advisors were not the procuring cause of any online sales, and that the Sales Advisors' alleged injuries had no connection to their theory of liability.

Defendants further contend that any alleged statements made to the Customers or Advisors were true (or believed to be true) at the time they were made, that reliance on any allegedly fraudulent statements cannot be demonstrated on a classwide basis, and that reliance on any allegedly fraudulent statements did not cause any actual injury. One of the factors to be considered as to the fairness of a class action settlement is a defendant's willingness and ability to mount just such a vigorous defense, as it demonstrates that the class may not have recovered all (or any) of what it sought at trial.

As explained above, the Settlement allows Class Members to receive direct monetary relief. Assuming the Court approves the late but otherwise valid claims, each Customer Class Member that submitted a Valid Claim will receive $8.19 (Tier 1), $16.38 (Tier 2), or $24.57 (Tier 3). Each Sales Advisor Class Member that submitted a Valid Claim will receive 6.12% of their sales between January 1, 2014, to August 17, 2014, which translates to payments ranging from $15.30 to $7,453.37, with an average payment of $426 and a median payment of $151.63. Each New Sales Advisor Class Member that submitted a Valid Claim will receive a full refund of the

price of the initial starter kits she purchased, which ranged from $99 to $149. (Shaffer Decl. ¶22.) These recoveries represent a substantial benefit for each of the three Classes, especially in light of the fact that Act II is now defunct and is no longer in business. Therefore, while Plaintiffs believe that their claims are strong, Plaintiffs are also aware of the inherent risks and costs of continuing with complex litigation of this nature. If Defendants were to prevail on their asserted defenses, Class Members, including Plaintiffs, would receive *no relief at all*. Given this possibility, the Settlement Agreement is a meaningful achievement. Accordingly, the Settlement provides a tangible benefit to all those affected by Defendants' repudiation of the lifetime guarantee and sudden closure of business.

**B.    The Complexity, Length, And Expense Of Continued Litigation.**

Due to the nature of Plaintiffs' case, trial will require the collection of evidence and witness testimony from across the country. Both Parties would examine a number of Act II's former employees, as well as the employees and agents of Act II's affiliates and other third-parties. Defendants intend to assert several defenses that they contend bar Plaintiffs' claim in whole or in part, which Plaintiffs would necessarily attempt to rebut. The uncertainty as to whether these defenses apply in this case creates substantial risk for both sides. Plaintiffs and proposed Class Counsel also recognize that the expense, duration, and complexity of protracted litigation would be substantial, and would require further briefing on numerous substantive issues, evidentiary hearings, further discovery, and the gathering of witnesses. And importantly, Act II is no longer in business, and has few, if any, assets available to satisfy a judgment.

**C.    The Settlement Classes' Reaction And Lack Of Opposition To The Settlement.**

Of the 3,951,997 Settlement Class Members, 158,225 individuals have submitted valid claims, which amounts to an overall claims-rate of 3.99%. The claims-rate for each Settlement Class are as follows: (a) Customer Class – 3.92%; (b) Sales Advisor Class – 16.84%; and (c) New

Sales Advisor Class – 15.58%. (Shaffer Decl. ¶23.) This is an *excellent* result. Indeed, the Classes'
enthusiasm for the Settlement cannot be understated, as the Settlement Administrator has received
over *500,000* visits to the Settlement website, over *8,100* calls, over *10,000* online inquiries and
over *1,100* mail inquiries from Class Members. (Shaffer Decl. ¶¶17-19.)

The reaction of the Classes is further underscored by the lack of opposition. Despite a
robust notice procedure involving direct notice via US mail & email, *and* publication notice via
Internet banners and Act II's social media webpages, only *114* individuals have opted out of the
Settlement. (*Id.* at ¶23.) The resultant opt-out percentage is *extremely* low, at only *0.00288%.* In
addition, this Settlement has received merely *two* objections (both pro se). (*Id.* at ¶24.)[7] Courts,
including this one, routinely find "extremely low percentage[s] of opposition favor[] a finding that
the settlement is fair, reasonable, and adequate." *Chase Bank,* 2016 WL 806549, at *9 (Feinerman,
J.); *In re Capital One Tel. Consumer Prot. Litig.,* 80 F. Supp. 3d 781, 792 (N.D. Ill. 2015)
(Holderman, J.) (similar); *In re Sw. Airlines Voucher Litig.,* No. 11 C 8176, 2013 WL 4510197, at
*7 (N.D. Ill. Aug. 26, 2013) (Kennelly, J.) (similar), *aff'd and modified on other grounds,* 799
F.3d 701 (7th Cir. 2015); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.,* 789 F. Supp.
2d 935, 965 (N.D. Ill. 2011) (St. Eve, J.) (similar); *In re Mexico Money Transfer Litig.,* 164 F.
Supp. 2d 1002, 1021 (N.D. Ill. 2000) (Pallmeyer, J.) (holding that "99.9% of class members have
neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the
settlements."), *aff'd,* 267 F.3d 743 (7th Cir. 2001). Thus, this factor weights strongly in favor of
final approval.

---

[7] As explained *infra* in Argument Section V, the Court should overrule these objections.

### D. Class Counsel's Opinion.

"The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23." *Schulte*, 805 at 586-87 (N.D. Ill. 2011). Here, Class Counsel has extensive experience in consumer class actions and complex litigation, and has settled (with court approval) numerous cases. (McLawhorn Decl. ¶17.) *In re Capital One,* 80 F. Supp. 3d at 792 (Holderman, J.) ("The court accepts that Class Counsel in this case are experienced litigators . . . and that they strongly support the settlement . . . this factor weighs in favor of approval."); *Walgreen*, 311 F.R.D. at 495 ("Class counsel in this case are highly experienced class action litigators who strongly support the proposed settlement. This factor weighs in favor of approval.").

Based upon proposed Class Counsel's analysis of the information obtained from Defendants during discovery and the four mediation sessions, the Settlement Agreement represents a significant recovery for the Settlement Classes, especially when weighed against Defendants' anticipated defenses and the inherent risks of litigation. Class Counsel believes that the Settlement confers a substantial benefit to the Settlement Classes and meets the class-certification requirements of Rule 23. (McLawhorn Decl. ¶¶18-20.)

### E. The Stage Of The Proceedings And The Amount Of Discovery Completed.

Based upon discovery conducted by the Parties, Plaintiffs believe they possess the evidence needed to evaluate the strengths and weaknesses of the case. Extensive discovery has taken place in this litigation. As explained *supra*, the Parties have reviewed tens of thousands of pages of documents, including those produced by various third parties. (McLawhorn Decl. at ¶7.) In addition, the Parties have prepared for the taking and/or defending the depositions of approximately ten fact witnesses from Act II, the six Class Representatives, and various third-parties. (*Id.*) Three of the Class Representatives were deposed. (*Id.* at ¶9.) In sum, counsel for each

party has sufficient information to assess the strengths, weaknesses, and likely expense of taking this case to trial.

While the Parties have both formally and informally exchanged information critical to evaluating the strength of Plaintiffs' contentions (and Defendants' defenses), the amount of discovery taken is not a prerequisite to a class action settlement. Courts have noted that, "the label of 'discovery' [either formal or informal] is not what matters. Instead, the pertinent inquiry is what facts and information have been provided." *Schulte*, 805 F. Supp. 2d at 587 (internal citation omitted); *Chase Bank*, 2016 WL 806549, at *9 (Feinerman, J.) ("Although this settlement-directed discovery is not identical to the full merits discovery that would enable counsel to better evaluate the merits of plaintiffs' claims, extensive formal discovery would entail substantial cost and might not have placed the parties in a materially better position than they are now to determine an appropriate settlement value.") (internal citations and quotations omitted); MANUAL FOR COMPLEX LITIGATION (Fourth), § 11.423 (2004) (noting that informal discovery is a recognized method of minimizing the cost, delay and burden associated with formal discovery).

Here, the Parties engaged in substantial formal and informal discovery over the period of a year that was critical to evaluating the strength of Plaintiffs' contentions and Defendants' defenses. In addition, the Parties reached this Settlement after *four* mediation sessions. Further, Class Counsel engaged with the Settlement Administrator to analyze Defendants' class data and determine whether effecting notice on the Classes was practicable, and the best practical manner to effect such notice. There is more than sufficient information for the Parties make a reasonable and informed decision as to the Settlement. Indeed, the Parties are well-equipped not just to make a reasonable and informed decision as to whether to settle on behalf of the Class, but also what the terms of such settlement would be. (McLawhorn Decl. ¶¶6-7, 9-11.)

## IV. THE COURT-APPROVED NOTICE PROGRAM SATISFIES DUE PROCESS.

The Parties effectuated class notice in a reasonable manner that was calculated to reach as many Settlement Class Members as possible who would be bound by the Settlement. In this case, the Settlement Administrator—Heffler Claims Group LLC—provided direct notice via mail and email, and publication notice via internet banner advertisements and social media posts. (Shaffer Decl. ¶¶8-19.) Specifically:

- On January 8, 2018, the Settlement Administrator initiated a Digital Media Program designed to effectively reach the Class Members through a highly targeted online paid media program, which served over 9,630,000 banner ad impressions nationwide across Google Network and various social media outlets. (*Id.* at ¶8.)

- On January 8, 2018, the Settlement Administrator released a press release regarding the settlement over PR Newswire's US 1 Newsline, which was picked up by 223 news outlets and organizations. (*Id.*)

- On January 8, 2018, the Settlement Administrator caused notice to be emailed to 2,011,857 Settlement Class Members. (*Id.* at ¶10.)

- In order to provide the best notice practicable, the Settlement Administrator ran all mail data through the USPS National Change of Address database. On January 23, 2018, the Settlement Administrator caused postcard notice to be mailed to 2,750,643 Settlement Class Members. (*Id.* at ¶13.)

- On December 6, 2017, the Settlement Administrator set up a PO Box to receive claim forms, exclusions, objections, and other communications about the Settlement. (*Id.* at ¶9.)

- On January 6, 2018, the Settlement Administrator established a toll-free number where Settlement Class Members may call and receive Settlement information 24/7 through an Interactive Voice Response (IVR) system. As of May 23, 2018, the Settlement Administrator has received 8,179 calls. (*Id.* at ¶18.)

- On January 7, 2018, the Settlement Administrator established the website www.liasophiaseettlement.com, where Class Members may learn about the Settlement, submit and download claim forms, and review relevant court filings. As of May 23, 2018, the website has received 503,263 visits. (*Id.* at ¶19.)

This robust notice plan, which was approved by the Court on December 6, 2017 (Dkt. No. 99), provided the best notice practicable to apprise the Settlement Classes of the pendency of this

action. Indeed, the Settlement Administrator estimates that notice reached approximately 87% of the Class Members. (Shaffer Decl. ¶16.)[8] Class Members only needed to fill-out a simple claim form that asks for basic information, which may be filed online via the Settlement Website or via U.S. mail (Shaffer Decl. ¶7.). *See Walgreen*, 311 F.R.D. at 499 ("[T]he claim form used in this case is short and direct."). The notice afforded them an opportunity to opt out of or present any objections to this Settlement, and complied fully with due process, as already found in the Court's preliminary approval order. (Dkt. No. 99 at ¶9.) Accordingly, the form and method of notice given to class members satisfies all the legal requirements of Rule 23, as well as the constitutional due process requirements.

## V.     THE OBJECTIONS TO THE SETTLEMENT SHOULD BE OVERRULED.

Two individuals have filed *pro se* objections to this Settlement: (a) Christine Pierce (Dkt. No. 100); and (b) Cara Menz (Dkt. No. 105). These objections should be overruled.

### A.     Objector Christine Pierce.

Objector Christine Pierce ("Pierce") objects to this Settlement because she "believe[s] it to be dishonest & a way for lawyers to become rich." (Dkt. No. 100.) In support thereof, Pierce states that Act II "went out of business." (*Id.*) Pierce provides no further reasoning or authority for her objection.

---

[8] The Federal Judicial Center's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide recommends a target of at least 70% reach for class action notice campaigns. Courts have used this figure to determine the success of notice campaigns. *See, e.g., In re: Cathode Ray Tube (Crt) Antitrust Litig.,* MDL No. 1917, 2016 WL 721680, at *31 (N.D. Cal. Jan. 28, 2016) (finding that 83% notice reach to be "well-within the acceptable range"); *Swift v. Direct Buy, Inc.,* No. 11-cv-401, 2013 WL 5770633, at *3 (N.D. In. Oct. 24, 2013) ("The Federal Judicial Center's checklist on class notice instructs that class notice should strive to reach between 70% and 95% of the class.").

To the extent Pierce believes the Settlement is "dishonest," the Court should overrule this objection because Pierce has not provided any evidence or reasoning as to why this is the case. As explained *supra,* this Settlement provides substantial monetary benefits—for some, in the thousands of dollars—to the three Settlement Classes. To the extent Pierce is complaining about the class action device as "dishonest" overall, the law recognizes class actions as a "legitimate part of the U.S. litigation system" and is expressly authorized via Federal Rule of Civil Procedure 23. *In re Sw. Airlines,* 2013 WL 4510197 at *10 (citing *In re AT&T,* 789 F. Supp. 2d at 982).

Similarly, Pierce does not explain why she thinks the Settlement is "a way for lawyers to become rich." Pierce has not indicated any specific issue she has with Plaintiffs' petition for attorneys' fees (Dkt. No. 103). In fact, Pierce filed her objection long *before* Plaintiffs' petition for fees, and has not supplemented her objection since. And, as demonstrated *supra* and in detail in Plaintiffs' Motion For Attorneys' Fees, Costs, and Incentive Awards (Dkt. No. 103), Plaintiffs' petition is very reasonable.

The only thing Pierce states in support of her objection is the fact that Act II "went out of business." She does not explain why this warrants denial of this Settlement. Moreover, to the contrary, the fact that Act II is no longer in business makes this Settlement all the more noteworthy, as it will provide substantive monetary benefits to—quite literally—hundreds of thousands of individuals who otherwise have no real recourse against a now-defunct entity. In sum, Pierce fails to provide adequate reasoning for why she believes this Settlement should be denied, and her objections should be overruled.

### B. Objector Cara Menz.

Objector Cara Menz ("Menz") objections were filed April 16, 2018. (*See* Dkt. No. 105.) Notice in this case was provided on January 8, 2018, with an objection deadline 90 days thereafter.

(Dkt. No. 99 at ¶11.) This falls on April 8, 2018, which is a Sunday. Thus, Class Counsel set the objection deadline for the following Monday—April 9, 2018. Accordingly, Menz's objection is untimely and should be overruled on this basis alone.

Regardless, Menz's bases for objecting are also meritless. Menz objects to Class Counsel's requested attorneys' fees. (Dkt. No. 105 at p. 2.) Specifically, Menz believes that Class Counsel will receive a "disproportionate percentage of the settlement" while Class Members will receive "a pro-rata distribution that amounts to pennies[.]" (*Id.* at pp. 2-3.) In addition, Menz claims that the existence of a "clear sailing" provision is a clear red flag to the Settlement. (*Id.*)

But neither an "unreasonable disparity" nor a "clear sailing" provision exist here. As articulated by the Seventh Circuit and explained *supra,* the *Redman* ratio here is 33.6%, which is in line with other settlements in this District. *See, e.g., Kaufman*, 2016 WL 806546 at *13 (awarding fees with a *Redman* ratio of 34.8%). Moreover, as detailed by Plaintiffs' Motion For Attorneys' Fees (Dkt. No. 103), Class Counsel seeks one-third of the Net Settlement Fund, which is, once again, in line with other settlements in this District. *See, e.g., Young v. Cty. of Cook,* No. 06-cv-552, 2017 WL 4164238, at *5-6 (N.D. Ill. Sept. 20, 2017) (Kennelly, J.) (awarding 33% of $32.5 million common fund); *Garcia v. J.C. Penny Corp.,* No. 12-cv-3687, 2017 WL 3449077, at *2 (N.D. Ill. Aug. 9, 2017) (Gottschall, J.) (awarding 35% of $5 million settlement fund); *Slaughter v. Wells Fargo Advisors, LLC,* No. 13-cv-6368, 2017 WL 3128802, at *3, 18, 24 (N.D. Ill. May 4, 2017) (Leinenweber, J.) (awarding 25% of $35.5 million settlement fund); *Briggs v. PNC Fin. Servs. Grp., Inc.,* No. 15-cv-10447, 2016 WL 7018566, at *3-4 (N.D. Ill. Nov. 29, 2016) (St. Eve, J.) (awarding 33% of $6 million settlement fund). Finally, Class Counsel's requested fees represents a 1.7 multiplier on its lodestar—which is well within reason. *See, e.g., Schulte,* 805 F.

Supp. 2d at 598 (multiplier of 2.5); *In re Cenco,* 519 F. Supp. at 327 (multipliers of 4 and 2); *Arenson,* 372 F. Supp. at 1359 (multiplier of 4).

Nor is there an "unreasonable disparity" between Class Counsel's fees and the class award. Menz does not make any specific complaint regarding Class Counsel's request, other than that it results in a purported "illusion of class recovery, while providing the defendant with the inexpensive release of claims and an end to litigation." (Dkt. No. 105 at p. 3.) But assuming the Court grants Plaintiffs' requests for settlement administration expenses, attorneys' fees and costs, and incentive awards, the Settlement will allow nearly *160,000* Class Members to share over *$3.5 million* in real, monetary benefits. Clearly, the Settlement provides a substantial recovery for the Settlement Classes, especially with regard to a defendant that has gone out of business. Likewise, Menz's objection to the alleged "clear sailing provision" is mysterious: *No such provision exists in the entirety of the Settlement.* (*See generally* Settlement Agreement, Exhibit 1.)

Menz's cited precedent—all of which are out-of-circuit—are also either unpersuasive or completely inapplicable. *In re Bluetooth Headset Prods. Liab. Litig.* involved a settlement agreement that: (a) provided for excessive attorneys' fees where the class received *no* monetary benefits; (b) had a "clear sailing agreement" in which defendants agreed not to object to an award of attorneys' fees up to eight times of a *cy pres* award built into the settlement; and (c) allowed for any attorneys' fees not awarded to revert back to the defendant. 654 F.3d 935, 947 (9th Cir. 2011).[9] Quite literally *none* of these factors are present here; in fact, the Settlement explicitly provides that

---

[9] Plaintiffs note that the 25% benchmark for attorneys' fees referenced by the Ninth Circuit in *Bluetooth* is *not* the standard in the Seventh Circuit. As detailed in Plaintiffs' Motion For Attorneys' Fees, Costs, And Incentive Award (Dkt. No. 103), the Seventh Circuit and numerous courts in this District have strongly endorsed the percentage of the recovery benefit method, with the presumption that attorneys' fees should generally total approximately *one-third* of the settlement fund. *Pearson v. NBTY, Inc.,* 772 F.3d 778, 782 (7th Cir. 2014); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,* 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015).

the entire Settlement Fund shall **not** revert back to Defendants. (Ex. 1, Section XV, ¶B.) Similarly, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.* involved solely non-monetary relief, and also "a *separate negotiation of the fee agreement* and the failure to disclose the amount of the award in the class notice[.]" 55 F.3d 768, 803 (3d Cir. 1995) (emphasis added). Again, this is inapplicable here. Finally, *Staton v. Boeing Co.* stood for the proposition that even when attorneys' fees are negotiated as part of a settlement, the court must still scrutinize the fees to determine whether they are unreasonably high, since higher attorneys' fees may impact the class' recovery. 327 F.3d 938, 964 (9th Cir. 2003). Once again, this is inapposite, because no attorneys' fees were ever negotiated between the Parties.[10]

In sum, Menz's objection to the requested attorneys' fees is entirely baseless. Menz has failed to provide legal and factual support for these objections. Indeed, not only does Menz rely almost exclusively on out-of-circuit precedent, she cites factual inaccuracies that simply do not exist in this case. Menz's objection to the requested attorneys' fees should be overruled.

Menz also objects to Plaintiffs' requested settlement administration expenses. (Dkt. No. 103 at pp. 3-4.) Menz claims that the "administrator is receiving nearly 20 percent of the settlement to be extremely unsuccessful in its primary role—distributing funds to class members." (*Id.* at p. 3.) Menz believes that, because "only a small fraction of the class members" will file claims, the Settlement Administrator should receive a smaller amount of settlement administration expenses. (*Id.*)

---

[10] Menz also contends that the claims process in this case was "unnecessary," but does not explain why. (Dkt. No. 103 at p. 3.) It is difficult for Plaintiffs to divine what Menz means by this statement. The claims process was undoubtedly necessary to the effectuation of this Settlement, which involved *three* different Settlement Classes and over 3.9 million individuals. In fact, the claims process of this Settlement was extremely successful, with nearly 160,000 valid claims submitted—a tremendously enthusiastic response by the Settlement Classes.

Menz's argument ignores how the settlement administration process works and misunderstands what a settlement administrator does. The Settlement Administrator—Heffler Claims Group LLC—has expended significant resources and costs in order to effectuate publication notice via Internet banners, direct notice via email and, most significantly, direct notice via U.S. mail. Efficient and effective settlement administration is *not* cheap when there are over 3.9 *million* class members to provide notice to. As of May 23, 2018, the Settlement Administrator has expended ***$1,083,433.47*** administering this Settlement, which includes $85,494.95 in printing and emailing notices, $710,135.34 postage costs, $19,948 media costs, and $267,855.18 in hourly fees. (Shaffer Decl. ¶26.) Contrary to Menz's depiction of settlement administration, these costs have nothing to do with how many Class Members end up submitting Valid Claims. Moreover, these costs have been well-warranted, as demonstrated by the Classes' enthusiastic response and high claims-rate—nearly 160,000 claims.[11] Additionally, the Settlement Administrator expects to incur another $300,000 in the future, after the Settlement is approved and benefit checks must be mailed. (*Id.*)

Finally, Menz cites *Redman v. RadioShack Corp.,* 768 F.3d 622, 630 (7th Cir. 2014), for the proposition that "district courts should scrutinize administrative costs to determine whether they really confer a benefit on the class before including them in fee-award calculations." (Dkt. No. 103 p. 3.) Menz purports that "there is no effort by class counsel to specifically describe, in detail, work performed and how that has conferred a benefit for the class. Much of the proposed administrative expense should be excluded from the proposed fee as the class will not receive a

---

[11] Menz also claims that "there is no indication the costs are necessary nor evidence of specific work that has been performed by the Administrator to justify this extreme amount." (Dkt. No. 103 p. 3.) However, the Declaration of Jonathan Shaffer *does* go into detail as to the extensive work the Settlement Administrator has performed thus far in this case, as well as the costs associated with that work. (*See generally* Shaffer Decl., Exhibit 3.)

benefit as a result of that expense." (*Id.* at pp. 3-4.) But this is entirely inapposite with regard to attorneys' fees in this case. Class Counsel's requested fees are one-third of the Settlement Fund *after* deduction of the settlement administration costs. As a result, Class Counsel's attorneys' fees are independent of the administrative expenses.

In short, Menz's objection to the requested settlement administration expenses is meritless and should be overruled.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court enter an order granting final approval of the Settlement.[12]


Dated: May 30, 2018                                    Respectfully submitted,

                                                      By:  *s/ Todd L. McLawhorn*

                                                      Joseph J. Siprut
                                                      *jsiprut@siprut.com*
                                                      Todd L. McLawhorn
                                                      *tmclawhorn@siprut.com*
                                                      Ke Liu
                                                      *kliu@siprut.com*
                                                      **SIPRUT PC**
                                                      17 N. State Street
                                                      Suite 1600
                                                      Chicago, Illinois  60602
                                                      Phone: 312.236.0000
                                                      Fax: 312.878.1342

                                                      *Counsel for Plaintiffs*
                                                      *and the Settlement Classes*

---

[12] A proposed order is attached hereto as Exhibit 4 and, assuming the Court approves the Settlement, will be submitted to the Court after the fairness hearing via the Court's proposed order inbox, with relevant revisions as necessary.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing

**Plaintiffs' Motion For Final Approval Of Class Action Settlement** was filed this 30th day of

May 2018 via the electronic filing system of the Northern District of Illinois, which will

automatically serve all counsel of record.


                                                  */s/ Todd L. McLawhorn*